Filed
D.C. Superior Court
02/18/2017 28:09PM
Clerk of the Court

## IN THE SUPERIOR COURT
## FOR THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| YOUNG N. CHO,<br>CI Rivers,<br>145 Parkers Fishery Road,<br>Winton, NC 27986<br><br>Plaintiff,<br><br>v.<br><br>MALLON & MCCOOL, LLC,<br>300 E. Lombard Street, Suite 815<br>Baltimore, MD 21202<br><br>and<br><br>STEVEN J. MCCOOL,<br>1776 K Street, N.W., Suite 200<br>Washington, DC 20006<br><br>and<br><br>JOSEPH T. MALLON,<br>300 E. Lombard Street, Suite 815<br>Baltimore, MD 21202<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> Civil Action No. 2017 CA 000902 M |

### COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff Young N. Cho, and for his Complaint against Defendants Mallon &

McCool, LLC, and Steven J. McCool and Joseph T. Mallon, respectfully states as follows:

### Nature of Case

This is an action for damages sustained by Plaintiff Young N. Cho as the result of acts and

omissions committed by Defendants (1) Mallon & McCool, LLC, a law firm doing business in the

District of Columbia, and (2) Steven J. McCool and (3) Joseph T. Mallon, lawyers admitted to practice

in the District of Columbia.

## Jurisdiction

1.       Jurisdiction of this Court is based upon D.C. Code § 11-921 *et seq.* and D.C. Code § 13-423, as the cause of action arise in the District of Columbia. Plaintiff seeks damages in excess of $25,000.00.

2.       This Court has jurisdiction over the parties pursuant to D.C. Code § 13-423(a)(1). Acts and omissions giving rise to Plaintiff's professional malpractice claim and claims based on related conduct arose under a legal representation agreement entered into in the District of Columbia and to be substantially performed in the District of Columbia, and the majority of the acts and omissions giving rise to Plaintiff's professional liability and related claims occurred in the District of Columbia.

## Parties

3.       Plaintiff Young N. Cho ("Plaintiff" or "Mr. Cho") is a citizen of the Republic of Korea and is presently incarcerated at CI Rivers, 145 Parker`s Fishery Road, Winton, NC 27986.

4.       Upon information and belief, defendant Mallon & McCool, LLC ("M&M, LLC") is a limited liability company formed and registered in the State of Maryland on about December 30, 1999, and operating as a law firm from two locations: (a) 1776 K Street, N.W. Suite 200, Washington, DC 20006; and (b) 300 E. Lombard Street, Suite 815 Baltimore, MD 21202.

5.       Upon information and belief, defendant Steven J. McCool ("Mr. McCool") is now and at all relevant times has been an adult resident of the State of Virginia. Upon information and belief, at all relevant times Defendant Mr. McCool was one of two members or partners of M&M, LLC, with apparent and actual authority legally to bind M&M, LLC.

6.       Upon information and belief, defendant Joseph T. Mallon ("Mr. Mallon") is now and at all relevant times has been an adult resident of the State of Maryland. Upon information and belief, at all relevant times Defendant Mr. Mallon was one of two members or partners of M&M, LLC, with

2

apparent and actual authority legally to bind M&M, LLC.

## Facts

7.      From in or about 2007 through late 2011 Plaintiff Young N. Cho, also known as Alex N. Cho, was the Chief Technology Officer of Nova Datacom, LLC ("Nova Datacom"). Nova Datacom was a provider of information assurance and security services to federal agencies and commercial companies. In September 2007, Nova Datacom was certified by the U.S. Small Business Administration ("SBA") as an 8(a) small disadvantaged business.

8.      Although Plaintiff Cho was called the Chief Technology Officer for Nova Datacom, Mr. Cho started Nova Datacom, controlled Nova Datacom, and made or approved all significant financial decisions concerning Nova Datacom.

9.      In late 2010, Mr. Cho became aware that the government was investigating the veracity of past performance certifications that Nova Datacom, and at least one employee of Nova Datacom, had made to the SBA. Mr. Cho sought legal advice from a Virginia-based attorney, "SP," who had previously represented Mr. Cho and Nova·Datacom on other legal matters. Attorney SP told Mr. Cho that he could represent Nova Datacom as well as the employee the government's investigators had targeted for an interview.

10.      Initially, Nova Datacom's employee, whom the government wanted to interview, agreed to accept SP's representation. Within weeks, however, and certainly by early 2011, the Nova Datacom employee had misgivings about SP's ability and willingness to represent the employee's interests to the extent the employee's interests might diverge from those of Nova Datacom and Mr. Cho, whom attorney SP had previously represented and whom SP also was representing at the same time. The Nova Datacom employee told Mr. Cho that he wanted to hire separate new counsel. Mr. Cho agreed to the employee's request and Mr. Cho agreed that Nova Datacom would pay for the

new counsel. The employee hired attorney "PB" as his new counsel.

11.     By early 2011, Mr. Cho had advised attorney SP that, in addition to the fact that one or more Nova Datacom employees were involved in falsifying past performance certifications—which Mr. Cho knew the government was then investigating—Mr. Cho was involved in a criminal bribery scheme. Mr. Cho explained that at the insistence of several government officials within the Army Corp of Engineers ("ACE"), he had paid the government officials in order to secure government contracts for Nova Datacom.

12.     Upon making these disclosures of criminal misconduct to attorney SP, attorney SP advised Mr. Cho that he should not disclose the bribery misconduct to the government at the time. SP told Mr. Cho that although the government was investigating Nova Datacom and its employees for past performance certification misconduct, it did not appear the government was currently aware of any bribery misconduct and it might never become aware of the bribery misconduct involving Mr. Cho. Attorney SP said he was confident he would be able to discern whether the government discovered the bribery scheme in time to alert Mr. Cho. Thereafter, Mr. Cho (through attorney SP) could either negotiate the best possible deal or choose to return to Korea. Attorney SP told Mr. Cho that he was willing to represent Mr. Cho in the matter involving the bribery, but that, in addition to the funds Mr. Cho had already paid to attorney SP for ongoing representation of Nova Datacom and Mr. Cho, including for representing Mr. Cho and Nova Datacom in the false past-performance certification investigation, Mr. Cho would need to provide an additional $250,000, as a "flat fee," to retain SP's representation of Mr. Cho with regard to the still undiscovered ACE bribery matter.

13.     Believing payment of a $250,000 flat fee to monitor the status of an investigation and then, possibly to negotiate a guilty plea, was excessive, Mr. Cho decided to investigate the cost of retaining different counsel.

14.     On about February 25, 2011, Mr. Cho was introduced to attorney Steven McCool of M&M, LLC. Mr. Cho met Mr. McCool for the first time at a lunch arranged through the efforts of another attorney, "PW." Mr. Cho had first asked attorney PW about his willingness to represent Mr. Cho with regard to the government's investigation into the government contracting activities of Nova Datacom. Attorney PW told Mr. Cho that an existing client conflict precluded attorney PW from representing Mr. Cho. Attorney PW suggested attorney Steven McCool to Mr. Cho and attorney PW offered to arrange for the two to meet.

15.     Mr. Cho later met attorney Steven McCool for lunch on about February 25, 2011. Their discussions continued after lunch. Later, Mr. Cho reached out to Mr. McCool, asking if he could meet with Mr. McCool the following Monday, February 28, 2011. Mr. McCool told Mr. Cho that he would not be in the office on Monday, but that he was available to meet with Mr. Cho on Tuesday, March 1, 2011.

16.     According to M&M, LLC invoices that Mr. McCool eventually provided to Mr. Cho almost two years later in January 2013, Mr. McCool drafted a "Fee Agreement" letter to Mr. Cho on Saturday, February 26, 2011. Upon information and belief, Mr. McCool emailed this initial Fee Agreement letter to Mr. Cho that same day.

17.     In the initial Fee Agreement letter, Mr. McCool wrote that M&M, LLC was being retained: "to represent [Mr. Cho] in connection with an investigation of Nova Datacom, LLC's government contracting practices by the Office of the United States Attorney for the District of Columbia." Mr. McCool also said: "Our hourly rate for partners is $550.00. We have agreed to reduce this hourly rate to $400.00 for this matter. Our rate for associates is $250.00 per hour. Our rate for paralegal assistants is $75.00 per hour." In his retainer letter, Mr. McCool also indicated that, in addition to fees, Mr. Cho would be responsible to reimburse M&M, LLC for "costs and expenses

5

we may incur in representing you, such as copying, postage, messenger service, cab fares, telephone, facsimile, travel expenses, court costs and fees for expert witnesses, investigators and other support services." Mr. McCool ended his Fee Agreement letter by informing Mr. Cho that "unless this Agreement is signed and received by the firm along with the retainer in the amount of $10,000, no further work can be done in connection with your matter."

18.     On about March 1, 2011, Mr. Cho met with Mr. McCool at M&M, LLC's Washington, D.C. offices at 1776 K Street, N.W., Suite 200, Washington, DC 20006. Mr. Cho signed the Fee Agreement letter and also provided the $10,000 retainer Mr. McCool requested.

19.     The $10,000 retainer payment came from Nova Datacom's account, but the payment came by Mr. Cho's direction and was returnable to Mr. Cho for his use if not properly earned by Mr. McCool and M&M, LLC to fund his legal representation. Pl. Ex. 1, p. 2 ("Declaration of Young N. Cho"). Mr. Cho explained to Mr. McCool that although his sister agreed to be the COA of Nova Datacom, Mr. Cho controlled the company and possessed dominion and control over Nova Datacom's assets. Pl. Ex. 1, p. 1. Mr. Cho's true ownership of Nova Datacom was known both to Mr. McCool at the outset of his representation and the government when Mr. Cho began cooperating in 2011. Pl. Ex. 1, p. 1. The February 26, 2011 fee agreement Mr. Mr. McCool drafted indicates Nova Datacom would pay for Mr. Cho's legal fees; however, Nova Datacom's untainted funds were Mr. Cho's funds. Pl. Ex. 1, p. 2. Mr. Cho controlled the money and caused Nova Datacom to provide the money to M&M, LLC. Pl. Ex. 1, p. 2.

20.     By undertaking to represent Mr. Cho, Mr. McCool was bound by applicable rules of professional conduct that required him to exercise the same skill as a reasonably competent attorney, to use reasonable care in defending Mr. Cho's legal interests, and to zealously represent Mr. Cho's interests, while acting at all times as a fiduciary.

6

21.     On March 1, 2011, Mr. Cho proceeded to describe his involvement in a multi-million dollar bribery scheme involving several government contracting officials at the Army Corps of Engineers.

22.     On or about March 2, 2011, Mr. Cho returned to M&M, LLC's DC offices and continued to explain his involvement in the ACE bribery scheme.

23.     During his early discussions with Mr. McCool, Mr. Cho told Mr. McCool he had disclosed the bribery scheme to attorney SP, after which attorney SP demanded $250,000 to represent Mr. Cho throughout the matter. Mr. Cho told Mr. McCool he had the money to pay the $250,000 fee but had thought SP's request for $250,000 was excessive. Mr. Cho also told Mr. McCool that attorney SP advised Mr. Cho not to meet immediately with prosecutors or other law enforcement officials because law enforcement officials might never uncover the ACE bribery scheme. Between late February 25 of March 2, Mr. McCool told Mr. Cho SP's $250,000 flat fee request was absurd. Within days of retaining Mr. McCool, Mr. McCool told Mr. Cho to provide Mr. McCool with an additional $200,000 of funds for M&M, LLC's retainer. Mr. McCool told Mr. Cho this would be more than enough money on retainer to complete the representation. Mr. Cho made this $200,000 payment by presenting Mr. McCool a cashier's check from his ASSUREIT SunTrust Bank account. Pl. Ex. 1, p. 2. Mr. Cho was the sole member and owner of ASSUREIT and operated ASSUREIT as a sole proprietorship. Pl. Ex. 1, p. 1. Mr. Cho possessed full dominion, control, and ownership over ASSUREIT's assets and disclosed his ownership interest to Mr. McCool in 2011. Pl. Ex. 1, p. 1.

24.     Before Mr. Cho provided a $210,000 retainer to Mr. McCool, Mr. McCool told Mr. Cho that amount would be adequate for M&M, LLC to complete Mr. Cho's entire case. Mr. Cho relied on this representation in hiring Mr. McCool and M&M, LLC, and in continuing to use them

7

as his counsel throughout 2011 and 2012.

25.     On March 3, 2011, Mr. McCool advised Mr. Cho that he should allow Mr. McCool immediately to disclose his criminal conduct to the government. Mr. McCool said "waiting to see what happened" was foolish because the first person to cooperate secured the best deal. Mr. McCool told Mr. Cho he should allow Mr. McCool to approach prosecutors in the U.S. Attorney's Office for the District of Columbia, rather than prosecution in the Eastern District of Virginia, because Mr. McCool, having once worked in the D.C. prosecutor's office, knew them and their bosses well. Mr. McCool explained that as a cooperator, Mr. Cho should expect a sentence ranging between 18-30 months.

26.     Mr. Cho expressed several concerns to Mr. McCool. He told Mr. McCool he wanted to know the parameters of a plea deal before he disclosed his involvement in a multi-million dollar bribery scheme. Mr. Cho indicated his goals included to limit his own exposure while ensuring that his cooperation did not jeopardize his ability to remain in the United States. Mr. Cho explained that although his wife and children were U.S. citizens, Mr. Cho was not. Mr. Cho expressed concern about disclosing information about which the government knew nothing without securing any commitments up-front, in return.

27.     Mr. McCool told Mr. Cho he had a special relationship with Ronald Machen, who was the United States Attorney for the District of Columbia in 2011. Mr. McCool said he was one of the few attorneys in the city able to walk into Mr. Machen's office and successfully negotiate directly with Mr. Machen. He told Mr. Cho, based on his close relationship with Mr. Machen, Mr. Cho would get a favorable deal and should make disclosures to the D.C. U.S. Attorney's Office. Mr. McCool told Mr. Cho that he could trust Mr. McCool to negotiate a highly favorable deal for Mr. Cho even after disclosures were made and leverage lost.

28.     To Mr. McCool, Mr. Cho also expressed concern about his sister, Min Cho. At the outset of Mr. McCool's representation of Mr. Cho, Mr. Cho explained that he wanted Mr. McCool, as part of any deal to be secured with the government, to ensure the government provided immunity to Min Cho, Nova Datacom's CEO.

29.     In response to Mr. Cho's request for immunity for his sister, Mr. McCool asked Mr. Cho why his sister needed immunity. He asked Mr. Cho whether his sister had participated in the bribery activities or knew of Mr. Cho's involvement in them. Mr. Cho told Mr. McCool his sister *had not participated* in Mr. Cho's bribery activity and knew nothing about it. Mr. McCool questioned why then, she needed immunity. Mr. Cho said he just wanted to be sure she was protected.

30.     Upon discussing with Mr. Cho his request for immunity for his sister, who was Nova Datacom's CEO, Mr. McCool recognized immediately that Mr. Cho was not being candid with him about his sister's involvement. Mr. McCool knew if Mr. Cho was seeking immunity for his sister, it was because Mr. Cho believed his sister had at least been aware of his and his company's criminal activity, if not involved in it.

31.     For most lawyers, especially those defending persons under investigation for or accused of a crime, trust between lawyer and client is the cornerstone of a meaningful lawyer-client relationship. Competent criminal defense attorneys understand that this relationship, as well as counsel's ability to provide effective representation, depend on the lawyer's assurances to the client that counsel will not betray the client's confidences. Counsel's obligation to safeguard the confidences and secrets of a client is also enshrined in the Model Code and Model Rules of Professional Responsibility in the Rules governing members of the D.C. Bar (including Mr. McCool and Mr. Mallon), and intertwined with state and federal constitutional protections. Coupled with a duty to provide zealous representation, counsel's duty to preserve a client's confidential

communications assure a client that defense counsel will work diligently at all times to advance the client's best interests.

32.     The duty to preserve a client's confidential information is explicitly set forth in Rule 1.6 of the District of Columbia Rules of Professional Conduct (hereinafter also "Rule"). Rule 1.6 provides: "Except when permitted under paragraph (c), (d), or (e), a lawyer shall not knowingly: (1) Reveal a confidence or secret of the lawyer's client; (2) Use a confidence or secret of the lawyer's client to the disadvantage of the client; (3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person." The disclosures permitted by paragraphs (c), (d), and (e) are inapplicable. Mr. McCool had a professional duty to maintain his client's confidences and to assure his client that confidential communications would be respected and preserved.

33.     Sensing Mr. Cho's lack of candor (with an attorney he had only just met who was advising him to cooperate without any deal in place), Mr. McCool should have explained to Mr. Cho, before he confessed his crime to government prosecutorial investigators, that while he could decline to speak to government investigators, once he chose to do so, he had to tell the truth because lying to federal investigators at any time could amount to a new federal crime. Mr. McCool also should have explained to Mr. Cho that candor with counsel was important and that Mr. Cho had a right to insist his communications with Mr. McCool would remain secret, protected by the attorney-client privilege and by the attorney's obligation under the Rules of Professional Conduct to keep his client's confidences. To the extent Mr. McCool provided any advice to Mr. Cho consistent with his profession's rules and maxims, Mr. McCool abrogated that advice when Mr. Cho asked Mr. McCool to secure immunity to his sister. Instead of advising Mr. Cho that his legal counsel needed to know the facts to properly advise Mr. Cho, Mr. McCool told Mr. Cho if he did not want to tell the government everything, he should not tell his lawyer everything, either. Mr. McCool told Mr.

10

Cho: "*I am not going to let you lie to the government so don't tell me anything you don't want them to know*." For several months, thereafter, Mr. Cho followed Mr. McCool's disaster-prone guidance by seeking to minimize his sister's involvement in the ACE bribery scheme during government debriefings. He finally came clean about his sister's involvement in the ACE bribery scheme at the beginning of June, 2011.

34.     Mr. Cho reasonably understood Mr. McCool's "it's okay to keep me in the dark" statement as advice that it was okay to withhold facts from government investigators provided he withheld those facts from his attorney, too. Trust does not flow from this sort of advice and trust between Mr. McCool and Mr. Cho dissipated after Mr. McCool imparted this "advice" to Mr. Cho. No competent counsel would have advised Mr. Cho that it was okay to lie as long as Mr. Cho also lied to Mr. McCool so Mr. McCool could continue to represent Mr. Cho while maintaining to prosecutors and the court, should lies eventually be uncovered, his own "plausible deniability." During his representation of Mr. Cho, Mr. McCool had a duty to protect his client.

35.     On March 3, 2011, Mr. McCool took Mr. Cho to meet with supervising and line prosecutors at the Office of the United States Attorney where they disclosed to the government criminal conduct involving Mr. Cho and others about which the government was unaware. The disclosed conduct involved a multi-million dollar bribery scheme involving Mr. Cho and other individuals, including several government officials.

36.     Despite the fact that the government was unaware of the bribery scheme, at no time before he advised Mr. Cho to disclose his criminal bribery misconduct did Mr. McCool seek to negotiate the parameters of a plea deal with the government. Instead, even after confirming from discussions with attorney PB that PB's client had disclosed the existence of the bribery scheme to the government during that client's debriefings, Mr. McCool advised Mr. Cho to disclose to

prosecutors and investigators criminal misconduct about which the government was unaware. Some of the misconduct, including the amount of and extent of bribe payments, would not have been discernable absent Mr. Cho's cooperation. Despite his awareness that he would be handing the government the evidence needed to pursue a massive bribery case against government officials, Mr. McCool did not seek to secure any pre-cooperation protection, whatsoever, for Mr. Cho.

37.     Upon information and belief, Mr. McCool advised Mr. Cho to go to the government with his information because Mr. McCool believed advising Mr. Cho to "wait and see," as attorney SP had advised Mr. Cho to do, might cause Mr. Cho to continue shopping for an attorney or decide to return to SP, the attorney he already knew, thereby generating less revenue for M&M, LLC. Mr. McCool had already expressed to others that the prior year had been slow, he knew another client was requiring considerable resources while generating little revenue, and he had few other active client matters at that time.

38.     As part of his disclosures to the government, Mr. Cho explained that Nova Datacom had paid a bonus to him of approximately $1 million. The bonus came from money paid by the government as part of one or more inflated contracts and the inflated money was intended to be paid as a bribe to one of the government officials soliciting bribes from Nova Datacom at the time. Mr. Cho explained how these funds had been removed from Nova Datacom at year's end in order to avoid an additional tax liability that would have been incurred had the money remained within Nova Datacom at year's end. After hearing about the scheme to disguise earmarked bribe money as bonus money, government prosecutors instructed Mr. Cho, in Mr. McCool's presence, to pay no bonus to himself or to any other of Nova Datacom's senior management. Mr. Cho, in Mr. McCool's presence, was told to refrain from removing any money (beyond standard operating expenses) from Nova Datacom absent government permission. Despite this directive, Mr. Cho and Mr. McCool

subsequently discussed whether Mr. Cho could remove more money from Nova Datacom to assist him and his family by putting it into M&M, LLC's attorney-client trust account (hereinafter "IOLTA") in order to "protect" these funds from the government's reach. Mr. Cho explained that most of the money his company earned came from legitimate (untainted) contracts and he wanted to obtain and preserve some additional funds for his eventual use, both to retain immigration counsel Mr. Cho expected he might need once his criminal case resolved, and to provide for his family's well-being during any period of Mr. Cho's incarceration. This discussion occurred on April 1, 2011, during and after a lunch at Nooshi, a restaurant on 19th Street in Washington D.C, within walking distance of Mr. McCool's office.

39.     Relying on Mr. McCool's assurance, Mr. Cho caused Nova Datacom to provide M&M, LLC a payment of $250,000 on or about May 11, 2011 and an additional payment of $250,000 on or about June 28, 2011. Pl. Ex. 1, p. 3. The parties understood that all of the additional $500,000 deposited into the IOLTA would be returned to Mr. Cho. Both payments were paid with funds drawn from Nova Datacom's bank account, per Mr. Cho's directions to his sister. Pl. Ex. 1, p. 3. Mr. Cho did not intent for the May 11th and June 28th transfers to be spent for M&M, LLC's legal fees. Pl. Ex. 1, p. 3. Before January 2013, Mr. McCool failed to provide two years' of invoices to Mr. Cho for work he and his law firm were allegedly performing for Mr. Cho. Thus, Mr. Cho was unaware M&M, LLC had exhausted all of his funds deposited into M&M, LLC's IOLTA account: all $710,000.

40.     When a government prosecutor saw Nova Datacom's bank records, he saw the large transfers from Nova Datacom to M&M, LLC and commented to Mr. McCool on the amount of funds transferred. Mr. McCool told the government, and then told Mr. Cho that he had told the government, that all of the funds Mr. Cho had transferred to the firm were for the purpose of

replenishing his law firm's retainer for Mr. Cho's legal fees even though Mr. McCool had already told Mr. Cho that the $210,000 deposited into the IOLTA was adequate to cover Mr. Cho's legal defense costs. Mr. McCool told Mr. Cho that he had deceived the government—further confirming in Mr. Cho's mind that the deception was okay.

41.     Within weeks of meeting Mr. Cho, Mr. McCool was speaking with another attorney, Biz Van Gelder, about Mr. Cho's criminal case. Mr. McCool advised Mr. Cho to convince his sister to fire the counsel she had previously retained to represent Nova Datacom and to retain Ms. Van Gelder, instead. At her brother's insistence, Min Cho retained Ms. Van Gelder and her firm to represent her and Nova Datacom. After Min Cho retained Ms. Van Gelder, Mr. McCool discovered that Ms. Van Gelder, working at a much larger law firm, intended to charge Min Cho and Nova Datacom significantly more than the $400/hour billing rate he agreed to accept and had been accepting as compensation for representing Mr. Cho through resolution of the ACE bribery matter. Mr. McCool told Ms. Van Gelder her billing rate was too high and he urged her to lower her rate. When she refused, Mr. McCool concocted a scheme to raise the rate M&M, LLC would bill to Mr. Cho, too.

42.     Although Mr. Cho was by then several months into his cooperation, on about June 22, 2011, Mr. McCool told Mr. Cho he would do "no further work" for Mr. Cho unless Mr. Cho agreed to pay Mr. McCool at a higher rate. Mr. McCool arranged for Mr. Cho to meet with Mr. McCool at his DC offices. Before the June 22, 2011 meeting, however, he drafted a new "Fee Agreement" letter. In the new (second) Fee Agreement letter, he wrote: "On February 26, 2011, Mallon & McCool, LLC agreed to represent you in connection with an investigation of Nova Datacom, LLC's ("NDC") government contracting practices by the Office of the United States Attorney for the District of Columbia ("USAO"). Since that time, as you know, the USAO has

expanded its investigation of you and NDC. The terms and conditions under which we propose to represent your interests in this new matter are set forth below."

43.     In the new Fee Agreement letter, Mr. McCool falsely characterized his ongoing representation of Mr. Cho as a "new matter." He knew the mater for which he had been representing Mr. Cho for the past four months was not a new matter but *the very same bribery matter* Mr. Cho disclosed to him on March 1 and 2, 2011. *See* Pl. Ex. 2 ("Declaration of Steven J. McCool"). Nevertheless, he was now "offering" to undertake that same matter, as a "*new matter*" to justify a new, higher, hourly rate. It was also a mechanism for Mr. McCool to document why additional funds were moving from Nova Datacom into his IOLTA should the government again question two large-dollar transfers.

44.     In his second, revised, Fee Agreement letter, Mr. McCool told Mr. Cho: "[A]s of June 1, 2011, we will no longer bill you at a reduced hourly rate of $400.00 in this matter. Instead, we will bill you at $550.00 per hour for partners." *See* Pl. Ex. 3 ("June 22, 2011 Fee Agreement").

45.     Despite Rule 1.16(b)'s prohibition against withdrawing from a client's representation unless the withdrawal can be accomplished without material adverse effect on the interest of the client, in his June 22, 2011 Fee Agreement letter, Mr. McCool told Mr. Cho: "[U]nless this [new] Agreement is signed and received by the firm no further work can be done in connection with your matter." In short, Mr. McCool told Mr. Cho that unless Mr. Cho agreed to pay M&M, LLC at a higher hourly rate, Mr. McCool would stop representing him even though Mr. McCool knew Mr. Cho had already taken Mr. McCool's advice, gone to the government, and admitted to criminal misconduct of which it had been unaware.

46.     Upon information and belief, Mr. McCool's partner, Mr. Mallon, knew of Mr. McCool's plan before it took effect and agreed to Mr. McCool's plan to raise the rates to be charged

to Mr. Cho four months into their firm's engagement. Upon information and belief, the two discussed characterizing the existing matter as a new mater in an effort to justify conduct they knew, ethically, was across the line.

47.     Mr. McCool also expected to receive no push-back from Ms. Van Gelder concerning his effort to inflate his firm's fees by characterizing the bribery case as a new matter. Even though she might recognize Mr. McCool's characterization of his ongoing representation of Mr. Cho as a "new matter" to be false, Mr. McCool had referred Min Cho and Nova Datacom to her and dropped his effort to have her lower her fee to correlate to his.

48.     When Mr. Cho arrived to meet with Mr. McCool on June 22, 2011, Mr. McCool proceeded to scream and swear at Mr. Cho. Mr. McCool said, among other things: "I'm sick of your shit and I'm not going to work at my discounted rate of $400, it's going up to $550. You can take it or leave." Mr. Cho believed he had no choice but to sign the second Fee Agreement because he was already well into the cooperation phase with the government. Because Mr. McCool had indicated he had an unusually close relationship with the U.S. Attorney, Mr. Cho also believed getting a new attorney would prejudice Mr. Cho. Only after Mr. Cho signed the letter did Mr. McCool stop his screaming. Mr. Cho left the office immediately after signing the letter. Mr. McCool did not record this client meeting on his invoices.

49.     By August 2011, as Mr. McCool knew, any solid attorney-client relationship he might have formed with Mr. Cho did not exist. After initially telling his client how to lie (withhold from the lawyer, first), after counseling his client to bonus himself by parking money in M&M, LLC's IOLTA, and after screaming at his client numerous times, including while breaking his own promise to represent Mr. Cho zealously for an agreed-upon rate, Mr. McCool and Mr. Cho were barely communicating. Despite his awareness that he and his client were barely communicating, however,

Mr. McCool did not advise Mr. Cho to take the balance of his retainer and seek out new representation. Rather, he and Mr. Mallon concocted additional ways to deplete all of the funds held in the IOLTA for Mr. Cho.

50.     Unbeknownst to Mr. Cho, Mr. McCool and Mr. Mallon intended to burn through as much of Mr. Cho's funds on deposition as possible. Previously, to another attorney working at M&M, LLC, Mr. McCool had explained his business model as one of using up as much of the retainer as possible as quickly as possible. He said, "you should never give retained funs back. When the retainer is exhausted, you ask for more."

51.     On about August 3, 2011, Mr. McCool and Mr. Mallon decided to hire several attorneys to review emails Nova Datacom was providing to the government in response to a subpoena. The documents were company emails, including emails involving Mr. Cho. Mr. Cho told Mr. McCool no review of his emails was necessary because Mr. Cho had already identified and provided the incriminating ones to the government as part of his ongoing cooperation. Nevertheless, Mr. McCool insisted on reviewing the emails. But recognizing his client did not want to spend the money for such a review, and knowing he intended a "spare no expense" review, presented a potential concern to Mr. McCool. Upon information and belief, Mr. McCool required Mr. Cho to "sign another letter" authorizing Mr. McCool to conduct the document review Mr. Cho had advised against. By this time, Mr. McCool recognized that Mr. Cho would sign whatever Mr. McCool directed him to sign and Mr. McCool believed written authorization provided cover to him and his firm should Mr. Cho later protest the exorbitant cost of a document review he said was unnecessary.

52.     Unbeknownst to Mr. Cho when he signed the authorization drafted by Mr. McCool, Mr. McCool had no plan to conduct an efficient review of emails; instead, he and Mr. Mallon

17

decided to hire "contract attorneys" whom they would pay as independent contractors to review Nova Datacom documents. M&M, LLC agreed to pay each attorney $20 per hour to read through every document. But the firm inflated the charge to Mr. Cho by over 1200%, charging Mr. Cho (by removing funds from the IOLTA in 2011 without telling Mr Cho until 2013) $250 per hour for their services. M&M, LLC made it appear on the invoices as though the contractors were M&M, LLC's employees. Despite having promised Mr. Cho in both his initial and their "revised" Fee Agreements that Mr. Cho would be responsible only for "actual expenses" the firm incurred in representing Mr. Cho, the firm charged Mr. Cho $250.00 for each hour each contractor said he or she spent reviewing documents Mr. Cho told Mr. McCool were unnecessary to review. For this unnecessary document review, Mallon and McCool would charge Mr. Cho over $65,000 even though its cost for the contractors amounted to $5,240. Invoices reflecting these excessive charges were not provided to Mr. Cho until January 2013, weeks before Mr. McCool moved to withdraw as Mr. Cho's criminal defense counsel.

53.     In August 2011, Mr. Cho learned the government wanted him to wear a wire against Thomas Kwon. Before that was scheduled to occur, Mr. Cho called Mr. McCool in a panic, asking Mr. McCool to intervene. He had explained to Mr. McCool that he could not wear a wire against Thomas Kwon because Mr. Kwon was like a surrogate brother to Mr. Cho. Mr. McCool swore at Mr. Cho, telling him he was a terrible cooperator who had lied to the government and should expect immediate incarceration if he pushed back against anything he was asked to do at this point. Upon information and belief, Mr. McCool made no effort to identify Mr. Cho's concern to the government. Mr. McCool never called the government to intervene on his client's behalf even though competent counsel would have alerted the government to his client's legitimate concern, which is precisely why Mr. Cho had called Mr. McCool and which is what he had explicitly asked

Mr. McCool to do.

54.     After his attorney failed him, Mr. Cho's "back-up plan" was to tell FBI Special Agent Jay Greenberg (whom by then Mr. Cho trusted more than Mr. McCool) of his concern about trying to "sting" Thomas Kwon. On numerous other occasions, S.A. Greenberg had been willing to postpone or revise an undercover operation when he sensed that Mr. Cho was nervous. Unfortunately, S.A. Greenberg did not show up for Mr. Kwon's operation. The government acknowledged that Mr. Cho "was remarkably effective in eliciting incriminating statements and actions." But he was not effective that day. When Mr. Cho was being forced to try to "sting" Mr. Kwon, he was crying. Mr. Cho signaled to Mr. Kwon that he was wearing a wire. Mr. Kwon made no incriminating statements at that time.

55.     When Mr. Cho's plea agreement was proposed to him, in about August 2011, Mr. Cho expressed to Mr. McCool his displeasure with the language about Mr. Cho's post-conviction immigration status. There was nothing in the plea agreement confirming Mr. Cho would be permitted to remain in this country following any sentence he might be ordered to serve. Mr. McCool told Mr. Cho not to worry about the plea agreement language. Mr. McCool told Mr. Cho he had spoken with Ron Machen, the U.S. Attorney. Mr. McCool said Mr. Machen promised he would make a personal call to John Morton, the Director of Immigration and Customs Enforcement, asking ICE to allow Mr. Cho to remain in the United States. Mr. McCool told Mr. Cho the plea agreement made no mention of Mr. Machen's promise to make a personal call because the United States Attorney did not want to write his promise into Mr. Cho's plea agreement. Mr. McCool told Mr. Cho that Mr. Machen said he did not want it to look like Mr. Cho was getting a "great" deal should any of Mr. Cho's co-conspirators decide to go to trial and he did not want other defendants to ask for the same deal—a promise by the U.S. Attorney to intervene personally on any other

cooperator's behalf. Mr. McCool told Mr. Cho the personal phone call from the U.S. Attorney meant his immigration concern was a non-issue, permanent residence status was "a done deal."

56.     Mr. McCool did not attend Mr. Cho's guilty plea hearing. The attorney he sent with Mr. Cho made no mention of the fact that Mr. Machen's promise was not explicitly included in the plea agreement when the court asked whether any promises other than those within the plea agreement had been made. Before the hearing, however, Mr. Cho relied on Mr. McCool's representations when he entered a guilty plea in September 2011. Before Mr. Cho's sentencing, however, Mr. McCool would deny telling Mr. Cho that Mr. Machen ever promised to pick up the phone and call the Director if ICE on Mr. Cho's behalf.

57.     In November 2011, the government learned from Thomas Kwon, who was by then also cooperating, that Mr. Cho had alerted Mr. Kwon to the fact that Mr. Cho was wearing a wire when the two conversed in August 2011. The government said Mr. Cho had obstructed justice—by trying to prevent Thomas Kwon from committing obstruction of justice. The government moved to revoke Mr. Cho's release status. Mr. McCool never argued that Mr. Cho's conduct did not constitute obstruction of justice even though it did not.

58.     After Mr. Cho was incarcerated, he asked Mr. McCool or Mr. Mallon for copies of the firm's invoices. Prior to this request, Mr. McCool had not been providing Mr. Cho invoices, even though the Fee Agreement provided M&M, LLC would provide Mr. Cho and NDC "invoices for services rendered and expenses incurred." Before Mr. Cho was incarcerated, Mr. McCool said it was not a good idea for him to provide invoices to Mr. Cho because his wife might see them and learn of his cooperation. (Although the lead case agent disagreed, Mr. McCool had advised Mr. Cho to tell his wife nothing about his ongoing legal concerns.) After Mr. Cho was incarcerated, Mr. McCool or Mr. Mallon told Mr. Cho he should not have invoices because another inmate might see

the invoices and discover that Mr. Cho was cooperating. In fact, Mr. McCool and Mr. Mallon did

not want to provide invoices to Mr. Cho because they did not what Mr. Cho to know that all of the

funds he had deposited into M&M, LLC's IOLTA were being depleted, not just the $210,000.

59.     On the eve of his anticipated sentencing, in about October 2012, Mr. McCool told

Mr. Cho that although his retainer was low, Mr. McCool would finish the case without requiring any

additional funds from Mr. Cho. Mr. Cho thought Mr. McCool meant the $210,000 retainer he paid

was near exhaustion, not that M&M, LLC had by then exhausted it as well as the additional

$500,000 deposited into M&M, LLC's IOLTA in 2011, before Mr. Cho was incarcerated in

November, 2011.

60.     On about January 4, 2013, Mr. McCool sent an associate to jail with a letter Mr. Cho

was advised to sign. The letter directed Mr. Cho to sign a check made payable to M&M, LLC and

authorized the firm to release $125,000 in funds held in a bank account Mr. Cho controlled to the

government, as a credit against his expected forfeiture, with the remaining balance of the account

(approximately) $17,000 to go to Mr. McCool for legal fees. Pl. Ex. 4 ("January 4, 2013 Letter from

Mr. McCool to Mr. Cho"). Mr. McCool's associate brought copies of invoices dated December 1,

2012 and January 1, 2013 to show Mr. Cho that his account balance was in arrears. The invoices did

not, however, show how the negative balance arose. Nor did they show that the $500,000 had been

exhausted in addition to the $210,000.

61.     In response to Mr. Mallon's letter, Mr. Cho made his last payment to M&M, LLC by

providing a check made payable to M&M, LLC for $142,236.15, again drawn on Mr. Cho's

ASSUREIT SunTrust Bank account. Pl. Ex. 1, p. 3. Mr. Cho's payment of fees to M&M, LLC were

*his* funds. M&M, LLC at all times understood and treated funds from Nova Datacom and

ASSUREIT as Mr. Cho's personal funds. Pl. Ex. 1. In Mr. McCool's January 4, 2013 letter to Mr.

Cho, he acknowledged his awareness at that time that funds he wanted to keep as additional legal fees were "funds in your [Mr. Cho's] ASSUREIT LLC Sun Trust [sic] Bank account[.]" Pl. Ex. 4. Mr. McCool understood ASSUREIT money belonged to Mr. Cho, as he told Mr. Cho he would ask the Assistant United States Attorney if $3,500 of the ASSUREIT funds could be transferred to Mr. Cho's wife for her personal use. Pl. Ex.1, p. 3; Pl. Ex. 4.

62.    Although Mr. McCool knew an attorney formerly associated with his firm had convinced the government to agree to allow Mr. Cho to credit, against any forfeiture amount he might owe, each dollar in taxes he or Nova Datacom paid to the federal government for funds not paid to bribe recipients (and thereafter deducted from Nova Datacom as a business cost), Mr. McCool made no effort to ensure funds available to Mr. Cho were ever used to pay taxes he knew Mr. Cho owed. Had the $125,000 Mr. McCool agreed to pay to the DOJ in late 2012 instead been paid to the Internal Revenue Service, Mr. Cho would have had lessened, by $125,000, *both* his tax liability and his forfeiture amount. Likewise, had the $202,000 Mr. McCool agreed to pay to the DOJ prior to then instead been paid to the Internal Revenue Service, Mr. Cho would have had lessened, by another $202,000, *both* his tax liability and his forfeiture amount. Mr. McCool, in a sworn declaration submitted to this Court, acknowledges "Mr. Cho was to receive credit for taxes paid on the overhead amounts he had previously retained." *See* Pl. Ex. 2.

63.    By late 2012, Mr. McCool had stopped advocating for Mr. Cho and was insisting, instead, that Mr. Cho allow him to tell the government and the sentencing court that Mr. Cho had lied not just to the government in 2011, but also to Mr. McCool. Mr. Cho rightly questioned the purpose of such a disclosure and how it could possibly benefit Mr. Cho. Mr. McCool was not suggesting that Mr. Cho should disclose that in 2011 Mr. McCool told Mr. Cho to withhold information from counsel that he wanted to keep secret from the government.

64.     In early 2013, on several occasions, Mr. Cho called Mr. McCool and Mr. Mallon, from jail, to ask one of them to provide him with copies of his invoices. By this time, however, Mr. McCool and Mr. Mallon were generally not answering calls from Mr. Cho, even though the firm was supposedly preparing Mr. Cho for a sentencing scheduled to occur in January 2013. Because Mr. Cho's calls continued to go unanswered, Mr. Cho asked his brother to call Mr. McCool's cell phone from a phone Mr. McCool would not recognize as coming from Mr. Cho or a family member. Mr. Cho's brother was able to reach Mr. McCool right away, he identified himself to Mr. McCool, and he told Mr. McCool his brother, Mr. McCool's client, wanted Mr. McCool to email all M&M, LLC invoices to the brother so that the brother could provide them to Mr. Cho as soon as possible.

65.     Thereafter, in January 2013, Mr. McCool came to the jail to confront Mr. Cho about his request for his invoices. Mr. McCool demanded to know why Mr. Cho was asking for his invoices. Mr. McCool told Mr. Cho that if he was going to try anything, Mr. McCool would be "relentless" and would come after him or anyone who came after Mr. McCool or his firm for its billing practices. Mr. McCool said: "There's a long list of people—I mean a short list of people—who've tried and they know what happened to them. Here are your invoices. The work has been done."

66.     Mr. McCool filed a motion to withdraw from Mr. Cho's representation on February 22, 2013. The Court granted Mr. McCool's motion on February 26, 2013.

67.     Mr. Cho originally filed suit on February 19, 2016. Defendants removed the case to federal court and the parties dismissed the case, without prejudice, pursuant to a tolling agreement dated October 7, 2016. The tolling agreement provided the lawsuit could be re-filed if the parties were unable to reach an agreement. Pursuant to the tolling agreement, the statute of limitations was tolled until March 31, 2017.

68.     Aware that M&M, LLC's invoices were finally subject to scrutiny, Mr. McCool re-reviewed them. By letter dated May 17, 2013, Mr. McCool wrote to Ms. Van Gelder, indicating he had reviewed his firm's invoices and identified "discrepancies." Nevertheless, he said, he was not adjusting the invoices to remove discrepancies, let alone returning any funds, because, he explained, he could have charged Mr. Cho *even more* for the services rendered than Mr. Cho was charged. Mr. McCool wrote: ". . . I have reviewed my invoices in this matter, and I am writing to inform you of the following: In May 2011, my hourly rate should have been $400, instead of the $550 that was charged. In December 2011, January, February and April 2012, Mark Henckel and Marshall Perkins were billed at an hourly rate of $275. They should have been billed at the associate's rate of $250 per hour. I have also noted some discrepancies in my notes and the invoiced hours. Even if all of these adjustments are made in NovaDatacom's favor, the amount owed by NovaDatacom to Mallon & McCool, LLC is still $6,644.41. Moreover, I have also noted over 100 instances where I failed to bill for telephone calls with Mr. Cho, his wife and the prosecutor in this case. I also failed to bill for meetings and other work. I have not supplemented my final invoice at this point, as, again; I understand that NovaDatacom is insolvent." In his January invoice, Mr. McCool listed a balance due of $34,832.06 meaning that, without even counting the final February 2013 invoice, Mr. McCool readily identified *almost $30,000 of improperly invoiced charges*. *See* Pl. Ex. 5 ("Mr. McCool May 17, 2013 Letter to Ms. Van Gelder").

69.     Despite having told Mr. Cho that all unearned IOLTA funds would be returned to Mr. Cho, thereby inducing Mr. Cho to cause Nova Datacom to deposit an additional $500,000 that Mr. Cho controlled into M&M, LLC's IOLTA in 2011, Mr. McCool was falsely maintaining (to Ms. Van Gelder and Mr. Cho's new counsel) that the money removed from M&M, LLC's IOLTA never really belonged to Mr. Cho, only to Nova Datacom. He said this because he knew that Ms. Van

Gelder would not ask for money back or request an audit of M&M, LLC's invoices and because he was trying to raise a defense should Mr. Cho sue him or his firm for false and fraudulent billings.

70.     A review of the invoices Mr. McCool finally provided to Mr. Cho reveals a pattern and practice of billing time not actually spent or not reasonably spent performing appropriate work, duplicative time entries, inflated time entries, and even occasions when funds were deducted from the IOLTA that either had never been put into the IOLTA, or that should have been credited back to the IOLTA when other attorneys returned portions of funds sent to them. Through a pattern of false and fraudulent billing, M&M, LLC has purported to have properly spent over $710,000—not for a contested trial, but for what was from day two, always guilty plea.

71.     In addition to the rate overcharges Mr. McCool identified in his May 17, 2013 letter, M&M, LLC's rate for partner should have remained at $400 per hour, not just through May 2011, but throughout the entire case.

72.     Mr. McCool never identified the discrepancies between his notes and hours invoiced yet appears to concede that "adjustments" were made in favor of higher invoice amounts. A review of some notes that were provided to new counsel after Mr. McCool was permitted to withdraw reveals several instances when time spent on a matter as recorded on Mr. McCool's notes was inflated on invoices. *See* Pl. Ex. 6 ("M&M, LLC March 2011 Billing Entries").

73.     The invoices Mr. Cho finally received also show extensive block billing for meeting preparation followed by a meeting, and numerous occasions when Mr. McCool's billed time vastly exceeds that of another participant in the meeting. On numerous occasions throughout 2011, moreover, Mr. McCool insisted that Mr. Cho come to M&M, LLC's offices for the day even though there was no need for Mr. Cho to be there. Mr. McCool would then bill Mr. Cho for the time he conversed with Mr. Cho as a client meeting, including time spent at lunches and even time spent

conducting Internet research with Mr. Cho to discern, among other things, good prices on a used Suburban Mr. McCool intended to purchase.

74.     On at least six occasions in 2011, Joe Mallon or another attorney billed Mr. Cho for time allegedly spent traveling from Baltimore to visit Mr. Cho at the Northern Neck Regional Jail. These trips cost Mr. Cho thousands of dollars (in two instances, over $6,000) even though a stamp or phone call would have sufficed. On several occasions, including on November 15, 2011 and November 22, 2011, another attorney from Mr. Mallon's Baltimore office accompanied Mr. Mallon on his travels to Warsaw, Virginia. Although no justification existed for charging that attorney's time travel time to Mr. Cho, it always was.

75.     In April 2011, Mr. McCool charged nearly 20 hours of time researching Mr. Cho's criminal history. On April 4, 2011, he lists 6.7 hours, the next day 6.1 hours the next day 7.6 hours. This research took, and only should have taken, a couple of hours to complete.

76.     In May 2011, Mr. McCool decided to learn immigration law at Mr. Cho's expense, even though M&M, LLC intended to hire an experienced immigration attorney (and did hire one) to assist in advising Mr. Cho. The invoices Mr. Cho finally received show that on May 3, 2011, Mr. McCool charged Mr. Cho for 9.8 hours to research immigration law. On May 5, 2011, he allegedly spent 8.1 hours researching immigration issues. On May 10, 2011, he allegedly spent 5.8 hours researching immigration issues. On May 16, 2011, he allegedly spent 11.1 hours drafting a memorandum in preparation for his meeting with an immigration attorney. On May 17, 2011 he allegedly met with the immigration attorney, charging Mr. Cho for 7.8 hours of time that day. On May 27 and 28, 2011, Mr. McCool spent 4.1 and 4.3 hours continuing to review immigration issues. The invoices show over 36 hours of time charged by Mr. McCool to Mr. Cho to research immigration law, even though the same information was readily available for far less cost by

engaging counsel with immigration expertise. No legitimate reason existed for Mr. Cho to spend Mr. Cho's money reviewing the nuances of immigration law. After meeting with immigration counsel, Mr. McCool said to a colleague that the immigration attorney's advice mirrored what he had learned.

77.     The invoices Mr. Cho finally received show that on June 13, 2011, Mr. McCool changed Mr. Cho for 5.3 hours of research time and that on June 14, 2011, Mr. McCool charged Mr. Cho for 4.8 hours of research time. In both instances, Mr. McCool indicated he was conducting research of "forfeiture (substitute assets)." But at that time M&M, LLC employed the former Chief of the Asset Forfeiture Unit of the United States Attorney's Office. There was, therefore, no need to conduct any research to discern whether substitute assets were forfeitable in a criminal prosecution. In fact, no such research occurred.

78.     Mr. McCool had previously advised his colleague that financially successful law firms do not return unspent retainers: they burn through retainers as quickly as possible and then ask for more. A review of the invoices Mr. Cho finally received indicates that Mr. McCool following his own advice, exhausting the bulk of Mr. Cho's retainer as quickly as possible by block-billing excessive amounts of time for unnecessary "research" and unnecessary document "review."

79.     On August 8, 2012, Mr. McCool charged Mr. Cho 3.7 hours to review notes, a co-conspirator's plea agreement and his statement of facts. Reviewing those documents should have taken no more than one hour's time. Nevertheless, on August 10, 2012, Mr. McCool charged 3.4 hours to review James Miller's plea agreement and statement of facts, and on August 11, 2012 he charged another 3.1 hours of his time to reviewing Larry Corbett's plea agreement and statement of facts. These were not lengthy documents.

80.     Indeed, on June 27, 2011, Mr. McCool billed Mr. Cho for 3.2 hours to "[r]eview client chronology." On June 28, 2011, he again billed Mr. Cho for the same work, this time for 3.3

hours. On July 6, 2011, Mr. Cho was charged for 2.3 hours of Mr. McCool's time, and on July 7, 2011 he was charged for 2.1 hours of time to review a chronology. Reviewing the chronologies that Mr. Cho prepared took minutes, not hours.

81.     In about August 2011, M&M, LLC sent $15,000 of IOLTA funds to the Caplin & Drysdale law firm in order to obtain legal advice concerning tax liabilities that might attach to Mr. Cho's criminal conduct. The invoices Mr. Cho finally received show that M&M, LLC deducted the $15,000 from the firm's IOLTA as an expense the firm incurred. The deduction occurred on February 29, 2012, not in August 2011, when the IOLTA funds were removed. By February 29, 2012, however, Caplin & Drysdale had already returned to M&M, LLC $10,826 of the $15,000 previously sent to it, after concluding that its tax matter with Mr. Cho was closed. Although Mallon and McCool deducted the entire $15,000 as a payment made to Caplin & Drysdale on its invoice dated February 29, 2012, it never credited back to Mr. Cho's IOLTA the $10,826 Caplin & Drysdale returned to it on about January 6, 2012. Thus, the IOLTA balance was depleted in early 2012 by $15,000 as payment to Caplin & Drysdale when, in fact, Defendants knew Caplin & Drysdale spent only $4,174 and returned $10,826. *See* Pl. Ex. 7 ("Caplin & Drysdale Letter").

82.     In June 2012, M&M, LLC performed a similar same sleight of hand, again. On its invoice dated July 1, 2012, it deducted from the funds held on Mr. Cho's behalf (in its IOLTA) $18,000 that Mr. Cho was permitted to provide to his wife as part of an agreement with the government. These funds were clean money that Mr. Cho had provided to Mr. McCool as cash, along with $202,000 of tainted cash, in 2011. Mr. McCool provided $202,000 of the cash Mr. Cho gave him to the government, but told Mr. Cho he would put the $18,000 of clean money into M&M, LLC's IOLTA until the government authorized its release to Mr. Cho. At no time had these funds ever been credited to the total amount of money deposited into the firm's IOLTA on Mr. Cho's

behalf (the $710,000). Thus, when the funds were subtracted from the IOLTA balance as an expense incurred in June 2012, similar to what occurred with the Caplin & Drysdale funds, the IOLTA balance provided to Mr. Cho reflected an expense amount deduced from the IOLTA funds (this time $18,000) that was not a proper expense at all. These funds have never been part of the IOTLA deposits.

83.     Mr. McCool also billed Mr. Cho for work he performed for another client. Mr. Cho's invoices for June 2011 reflect that on June 9, 2011, Mr. McCool invoiced Mr. Cho for 6.5 hours of his time spent to "[r]esearch money laundering issues[.]" But there were no money laundering issues impacting Mr. Cho that required researched by Mr. McCool on June 10, 2011. In fact, in June 2011, Mr. McCool was researching money laundering issues on behalf of another firm client who had been indicted for money laundering and who was pending trial (which occurred during the fall of 2011). Although M&M, LLC employed an attorney with expertise in money laundering in June 2011, that attorney was precluded from working on Mr. McCool's other client's matter due to his prior employment at the Department of Justice. But, by June 2011, Mr. McCool's other client's retainer was exhausted. Mr. McCool chose to add 6.5 hours of money laundering research to Mr. Cho's invoice to compensate Mr. McCool for the time he spend researching money laundering on behalf of that other client.

84.     The invoices Mr. Cho finally received show that M&M, LLC started billing law clerk Julia Fisher at a $200 per hour attorney rate in August 27, 2012. Prior to that time she had been billed at a rate of $75 per hour. Upon information and belief, Ms. Fisher did not graduate from law school until May 2012, took the Maryland Bar Exam in about July 2012, and was first admitted to practice law as an attorney (in Maryland) in December 2012.

85.     Mr Cho was sentenced in October 2015. He received seven years four months

incarceration. At his sentencing hearing, the government told the court that had Mr. Cho not misled

investigators during his early debriefings, as Mr. McCool suggested he might do, and not alerted Mr.

Kwon to the fact that he was wearing a wire, which would not have occurred had Mr. McCool

properly intervened to assist his client, the government would have asked for Mr. Cho to receive a

much lower sentence.

## COUNT I
### (Professional Negligence/Malpractice)

86.     All preceding paragraphs 1-85 are incorporated by reference as though fully set forth

herein.

87.     Plaintiff retained Defendants as his legal counsel to provide legal services in

representing Plaintiff in a criminal bribery case.

88.     Defendants agreed to provide legal representation, and provided legal representation

on Plaintiff's behalf.

89.     Arising from this client-attorney relationship, Defendants had the duty to provide

effective assistance of counsel, use reasonable care in defending Plaintiff, provide Plaintiff with

qualified and competent attorneys and staff who would not overbill, to discharge their obligations to

Plaintiff in an effective manner, properly maintain Plaintiff's funds in the IOLTA, to place Plaintiff's

interests ahead of Defendants' interest in collecting excessive legal fees, to charge only reasonable

fees, to exercise due care and reasonable diligence, and to otherwise serve Plaintiff's best interests

consistent with applicable Rules of Professional Conduct.

90.     Defendants failed to exercise the skill, knowledge, and care ordinarily exercised by

other attorneys under similar circumstances.

91.     Defendants breached their duties by, *inter alia*: raising billing rates without Plaintiff's

voluntary consent; billing Plaintiff for nonexistent and unnecessary work; charging fees in excess of the value of the results obtained; charging for unnecessary and unauthorized services; mishandling Plaintiff's funds in the IOLTA; by failing to protect Plaintiff's post-conviction immigration status; failing to seek pre-cooperation protection; failing to make efforts to minimize Plaintiff's tax liability and forfeiture amount; not adequately providing assistance for Plaintiff's concerns when he assisted the government's investigation by wearing a wire; failing to protect client confidences and suggesting Plaintiff could lie to government officials; and charging an unreasonable and excessive number of hours for the reasonable value of the legal services received.

92.     But for Defendants' acts and omissions, Plaintiff would have spent far less for his representation, would have been assured that his immigration status was secure, and would have received a more favorable sentence.

93.     As a result of Defendants' breaches of duties owed to Plaintiff, Plaintiff was damaged and will continue to suffer damage, including payment of excessive legal fees, payment of additional legal fees, payment of additional tax liability, longer incarceration, likely deportation, and other damages to be proven at trial.

94.     Defendants' breach of duties to Plaintiff was a proximate cause of Plaintiff's damages.

95.     As a result of Defendants' breaches, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

## COUNT II
### (Breach of Fiduciary Duty)

96.     All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

97.     On about March 1, 2011, Plaintiff retained Defendants as his legal counsel to provide legal services in representing Plaintiff in a criminal investigation involving bribery.

98.     Defendants agreed to provide legal representation, and provided legal representation on Plaintiff's behalf.

99.     Arising from this client-attorney relationship, Defendants owed Plaintiff a fiduciary duty.

100.     Defendants in equity and good conscience were bound to act in good faith and with due regard to Plaintiff's interests.

101.     Arising from this client-attorney relationship, Defendants had the duty to provide effective assistance of counsel, use reasonable care in defending Plaintiff, provide Plaintiff with qualified and competent attorneys and staff who would not overbill, to discharge their obligations to Plaintiff in an effective manner, properly maintain Plaintiff's funds in the IOLTA, to place Plaintiff's interests ahead of Defendants' interest in collecting excessive legal fees, to charge only reasonable fees, to exercise due care and reasonable diligence, and to otherwise serve Plaintiff's best interests consistent with applicable Rules of Professional Conduct.

102.     Defendants breached their duties by, *inter alia*: raising billing rates without Plaintiff's voluntary consent; billing Plaintiff for nonexistent and unnecessary work; by charging fees in excess of the value of the results obtained; charging for unnecessary and unauthorized services; mishandling Plaintiff's funds in the IOLTA; failing to protect Plaintiff's post-conviction immigration

status; failing to seek pre-cooperation protection; failing to make efforts to minimize Plaintiff's tax liability and forfeiture amount; failing to protect client confidences and suggesting Plaintiff could lie to government officials; and charging an unreasonable and excessive number of hours for the reasonable value of the legal services received.

103.    The Defendants' foregoing breaches violated District of Columbia Rule of Professional Conduct 1.3 regarding the diligence and zeal of Defendants' representation, 1.5 regarding the reasonableness of fees and safekeeping of property, and 1.6 concerning confidentiality of information.

104.    But for Defendants' acts and omissions, Plaintiff would have spent far less for his representation, would have been assured that his immigration status was secure, and would have received a more favorable sentence.

105.    As a result of Defendants' breaches of duties owed to Plaintiff, Plaintiff was damaged and will continue to suffer damage, including additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

106.    Defendants' breach of duties to Plaintiff was a proximate cause of Plaintiff's damages.

107.    As a result of Defendants' breaches, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

## COUNT III
### (Breach of Contract)

108.    All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

109.    On about March 1, 2011, Plaintiff and Defendants entered into agreement by which

Defendants agreed to provide legal services in representing Plaintiff in a criminal bribery case.

110.    The agreement required a $10,000 retainer, which Plaintiff paid.

111.    The agreement also obligated Defendant M&M, LLC's partners to bill at a discounted rate of $400.00 per hour.

112.    The forgoing provisions were material terms to the agreement.

113.    Defendant breached this agreement by, *inter alia*, raising billing rates without Plaintiff's voluntary consent and exhausting additional funds deposited into the IOLTA that were not authorized to be used as M&M, LLC's legal fees.

114.    Plaintiff carried out all of his material duties and responsibilities under the terms of the contract, acting in good faith at all times.

115.    But for Defendants' breaches, Plaintiff would have spent far less for his representation.

116.    As a result of Defendants' breaches, Plaintiff was damaged and will continue to suffer damage, including excessive and additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

117.    As a result of Defendants' breaches, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

## COUNT IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

118.    All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

119.    On about March 1, 2011, Plaintiff and Defendants entered into agreement by which Defendants agreed to provide legal services in representing Plaintiff in a criminal bribery matter.

34

120.     Implied in Defendants' agreement with Plaintiff is Defendants' obligation to act fairly and in good faith with Plaintiff and to refrain from depriving Plaintiff the benefit of the agreement.

121.     Defendants breached their duty by, *inter alia*: raising billing rates without Plaintiff's voluntary consent; billing Plaintiff for nonexistent and unnecessary work; by charging fees in excess of the value of the results obtained; charging for unnecessary and unauthorized services; mishandling Plaintiff's funds in the IOLTA; failing to protect Plaintiff's post-conviction immigration status; failing to seek pre-cooperation protection; failing to make efforts to minimize Plaintiff's tax liability and forfeiture amount; failing to protect client confidences and suggesting Plaintiff could lie to government officials; and charging an unreasonable and excessive number of hours for the reasonable value of the legal services received.

122.     Defendants evaded the spirit of the contract and willfully rendered imperfect performance.

123.     As a result of Defendants' breaches, Defendant destroyed and/or injured Plaintiff's right to receive the fruits of the agreement.

124.     As a result of Defendants' breaches, Plaintiff was damaged and will continue to suffer damage, including excessive and additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

125.     As a result of Defendants' breaches, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

## COUNT V
### (Negligent Misrepresentation)

126.     All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

127.     On about March 1, 2011, Plaintiff and Defendants entered into agreement by which Defendants agreed to provide legal services in representing Plaintiff in a criminal bribery case.

128.     Defendants made false statements, including, *inter alia*, that: they would bill Plaintiff at a partner hourly rate of $400 for his matter; a $210,000 retainer would be adequate for Plaintiff's entire case; they would hold Plaintiff's $500,000 in the IOLTA to be returned to Plaintiff; they would return the unearned $210,000 IOLTA funds; that they were handling Plaintiff's post-conviction immigration status though oral assurances of Mr. Machen; that it was okay to keep secrets from the government provided they were kept from counsel, too; and that Mr. McCool had a special relationship with then-United States Attorney for the District of Columbia Ronald Machen and his supervisors which would benefit Plaintiff if he used Mr. McCool/M&M, LLC as his legal counsel.

129.     Defendants omitted the fact they had depleted the $710,000 of Plaintiff's funds deposited in the IOLTA in the process of representing Plaintiff in the investigation and guilty plea proceedings.

130.     Defendants had a duty to disclose the foregoing omission.

131.     Defendants were acting in the ordinary course of its business in making the foregoing false statements and omissions to Plaintiff.

132.     Involving Plaintiff's funds held in trust, Defendants' false statements and omissions involved a material issue.

133.     Plaintiff reasonably relied on Defendants' false statements and omissions to his

detriment. Defendants' representations and promises would likely have induced a reasonable person to rely upon them. But for Defendants' acts and omissions, Plaintiff would have spent far less for his representation, would have been assured that his immigration status was secure, he would have received a more favorable sentence, and he would have ensured that his funds deposited into the IOLTA remained secure.

134.    As a result of Defendants' false statements and omissions, Plaintiff was damaged and will continue to suffer damage, including excessive and additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

135.    Defendants' false statements and omissions to Plaintiff were a proximate cause of Plaintiff's damages.

136.    As a result of Defendants' false statements and omissions, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

## COUNT VI
### (Fraudulent Misrepresentation)

137.    All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

138.    On about March 1, 2011, Plaintiff and Defendants entered into agreement by which Defendants agreed to provide legal services in representing Plaintiff in a criminal bribery case.

139.    Defendants made false statements, including, *inter alia*, that: they would bill Plaintiff at a partner hourly rate of $400 for his matter; a $210,000 retainer would be adequate for Plaintiff's entire case; they would hold Plaintiff's $500,000 in the IOLTA to be returned to Plaintiff; they would return the unearned $210,000 IOLTA funds; that they were handling Plaintiff's post-conviction immigration status though oral assurances of Mr. Machen; that it was okay to keep

secrets from the government provided they were kept from counsel, too; and that Mr. McCool had a special relationship with then-United States Attorney for the District of Columbia Ronald Machen and his supervisors which would benefit Plaintiff if he used Mr. McCool/M&M, LLC as his legal counsel.

140.    Defendants willfully omitted the fact they depleted the entirety of the $710,000 of Plaintiff's funds in the IOLTA in the process of representing Plaintiff.

141.    Defendants had a duty to disclose the foregoing omission.

142.    Defendants were acting in the ordinary course of their business in making the foregoing false representations to willful omissions to Plaintiff.

143.    Involving Plaintiff's funds held in trust, Defendants' false representations and willful omissions involved a material fact.

144.    Defendants had knowledge of the foregoing false representations and willful omissions.

145.    Defendants intended to induce Plaintiff to rely on the false representations and willful omissions in order to maintain the attorney-client relationship so that Defendants could continue to bill Mr. Cho and remove funds from the IOLTA.

146.    Plaintiff reasonably relied on Defendants' false representations and willful omissions to his detriment. Defendants' representations and promises would likely have induced a reasonable person to rely upon them. But for Defendants' false representations and willful omissions, Plaintiff would have spent far less for his representation, would have been assured that his immigration status was secure, he would have received a more favorable sentence, and he would have ensured that his funds deposited into the IOLTA remained secure.

147.    As a result of Defendants' false representations and willful omissions, Plaintiff was

damaged and will continue to suffer damage, including additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

148.    Defendants' false representations and willful omissions to Plaintiff were a proximate cause of Plaintiff's damages.

149.    As a result of Defendants' false representations and willful omissions, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

## COUNT VII
### (Fraudulent Inducement)

150.    All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

151.    Defendants falsely represented: that they would provide competent legal services, Mr. McCool had a special relationship with then-United States Attorney for the District of Columbia Ronald Machen that would benefit Plaintiff; it would bill Plaintiff at a partner hourly rate of $400 for his matter; a $210,000 retainer would be adequate for Plaintiff's entire case; they would hold Plaintiff's $500,000 in the IOLTA to be returned to Plaintiff; they would return the unearned $210,000 IOLTA funds; and that they were handling Plaintiff's post-conviction immigration status.

152.    The above described representations and promises made to Plaintiff by the Defendants were false and fraudulent when made, and were purposely made with Defendants' knowledge and for the purpose of inducing Plaintiff to maintain the attorney-client relationship and to provide addition funds to the IOLTA so that Defendants could continue to remove funds from the IOLTA.

153.    Involving Plaintiff's funds held in trust, Defendants' false representations and willful omissions involved a material fact.

154.    Defendants had knowledge of the falsity of its representations.

155.    Defendants made these representations with the intent to deceive and to induce Plaintiff to continue in an attorney-client relationship with Defendants and to put more funds into the IOLTA.

156.    Plaintiff relied on Defendants' false representations to his detriment. Defendants' representations and promises would likely have induced a reasonable person to rely upon them. But for Defendants' false representations, Plaintiff would have spent far less for his representation, would have been assured that his immigration status was secure, and would have received a more favorable sentence.

157.    As a result of Defendants' false representations, Plaintiff was damaged and will continue to suffer damage, including excessive and additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

158.    Defendants' false representations to Plaintiff were a proximate cause of Plaintiff's damages.

159.    As a result of Defendants' false representations, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

### COUNT VIII
### (Fraudulent Concealment)

160.    All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

161.    Defendants had a duty to disclose that they had depleted the entirety of the $710,000 of Plaintiff's funds in the IOLTA and charging of excessive fees.

162.    Defendants failed to disclose the foregoing facts to Plaintiff.

163.     Defendants intended to defraud or deceive Plaintiff in failing to disclose the material facts.

164.     Plaintiff took action in justifiable reliance on the concealment by continuing his representation with Defendants. But for Defendants' acts and omissions, Plaintiff would have spent far less for his representation, would have secured different counsel sooner, would have been assured that his immigration status was secure, and would have received a more favorable sentence.

165.     As a result of Defendants' failure to disclose, Plaintiff was damaged and will continue to suffer damage, including excessive and additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

166.     Defendants' failure to disclose to Plaintiff was a proximate cause of Plaintiff's damages.

167.     As a result of Defendants' failure to disclose, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

## COUNT IX
### (Civil Conspiracy)

168.     All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

169.     Defendants Mr. Mallon and Mr. McCool conspired to participate in unlawful conduct, and to engage in lawful conduct through unlawful means, such conduct including the following:

    a.   The **Breaches of Contract** by Defendants, as described in paragraphs 102-111 of this Complaint (Count III), the allegations of which are realleged and incorporated by reference;

    b.   The **Fraudulent Misrepresentations and Omissions** by Defendants, as described in paragraphs 131-143 of this Complaint (Count VI), the allegations of which are

realleged and incorporated by reference;

c.  The **Fraudulent Inducement** by Defendants, as described in paragraphs 144-153 of this Complaint (Count VII), the allegations of which are realleged and incorporated by reference; and

d.  The **Fraudulent Concealment** by Defendants, as described in paragraphs 154-161 of this Complaint (Count VIII), the allegations of which are realleged and incorporated by reference.

170.    Pursuant to, and in furtherance of, the common scheme, Plaintiff was injured by Defendants' raising of billing rates without Plaintiff's voluntary consent, billing Plaintiff for non-existent and unnecessary work, charging a fee in excess of the value of the results obtained, charging for unnecessary and unauthorized services, and charging an unreasonable and excessive number of hours for the reasonable value of the legal services received.

171.    As a result of Defendants' agreements, Plaintiff was damaged and will continue to suffer damage, including excessive and additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

172.    Defendants' agreements were a proximate cause of Plaintiff's damages.

173.    As a result of Defendants' agreements, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $800,000.

## COUNT X
### (Unjust Enrichment)

174.    All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

175.    Throughout the duration of Defendants' representation of Plaintiff, Defendants billed Plaintiff in excess of $210,000, which amount they represented would be more than adequate for the services, and expenses required for the scope of Plaintiff's representation.

176.     Plaintiff conferred a benefit upon Defendants. Defendants' excessive fees were wrongfully charged to Plaintiff. Defendants were not entitled to the money, interest, and profits it received from Plaintiff because Defendants raised billing rates without Plaintiff's voluntary consent, billed Plaintiff for unnecessary work, charged a fee in excess of the value of the results obtained, charged for unnecessary and unauthorized services, and charged an unreasonable and excessive number of hours for the reasonable value of the legal services received.

177.     Defendants accepted and retained the benefit.

178.     Defendants knew, or reasonably should have known, that it received and retained money, interest, and profits rightfully belonging to Plaintiff to which Defendants were not entitled.

179.     Defendants have received and retained money for competent representation that Defendants failed to provide Plaintiff.

180.     Due to Plaintiff's payment of excessive and unjustified fees, Defendants have enjoyed substantial profits.

181.     It would be unjust for Defendants to retain the benefits conferred upon them as a result of their failure to provide competent legal services, charging of excessive legal fees, binding Plaintiff to financial obligations that were not owed, and its continuances of these practices while knowing of the harm it caused Plaintiff.

182.     As a result of Defendants' unjust enrichment, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $500,000.

## COUNT XI
### (Promissory Estoppel)

183.     All preceding paragraphs 1-85 are incorporated by reference as though fully set forth herein.

184.     Plaintiffs and Defendants agreed that Plaintiff would provide Defendants with funds to put into the M&M, LLC escrow account in order to "protect" these funds from the government's reach so as to assist Plaintiff and his family at a later date.

185.     Defendants agreed to allow Plaintiff to move funds from Nova Datacom to M&M, LLC's IOLTA.

186.     Defendants told Plaintiff they would return to Plaintiff or to his spouse all funds remaining in the IOLTA upon conclusion of Plaintiff's criminal case. In making this representation, Defendants reasonably induced Plaintiff to rely on the promise.

187.     Plaintiff relied on the promise to his detriment by causing $500,000 in additional funds to be transferred to M&M, LLC's IOLTA with the understanding that all of the $500,000 would be retuned to Plaintiff.

188.     Defendants never returned to Plaintiff the $500,000 they promised would be returned to Plaintiff.

189.     In January 2013, Plaintiff discovered Defendants had spent all $710,000 of Plaintiff's IOLTA-deposited funds.

190.     As a result of Defendants' promises, Plaintiff was damaged and will continue to suffer damage, including additional legal fees, additional tax liability, likely deportation, and other damages to be proven at trial.

191.     Defendants' false promises to Plaintiff were a proximate cause of Plaintiff's damages.

192.     As a result of Defendants' false promises, Defendants have damaged Plaintiff in an amount to be determined at trial and believed to exceed of $500,000.

## Prayer for Relief

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(a) Compensatory damages in the amount of not less than $1 million, which amount will be proven at trial;

(b) Punitive damages in an amount to be proven at trial;

(c) All cost associated with this action;

(d) Pre- and post-judgment interest as permitted by law; and

(e) Such other and further relief as this Court deems proper.

## Jury Demand

Plaintiff demands a trial by jury to the maximum extent permitted by law.

Respectfully submitted,

YOUNG N. CHO

BY:     FEDERAL PRACTICE GROUP

Eric S. Montalvo
DC Bar No. 993206
1750 K Street, NW, Suite 900
Washington, DC 20006
(202) 808-3124 (Tel.)/(888) 899-6053 (Fax)
emontalvo@fedpractice.com

Plaintiff's Exhibit 1

Declaration of Young N. Cho

## DECLARATION OF YOUNG N. CHO

I, Young N. Cho, make the following statement:

1. My name is Young N. Cho. I am also known as Alex Cho.

2. I am a person over eighteen (18) years of age and competent to testify to the following information.

3. On February 5, 2004, I formed Nova Datacom, LLC in the Commonwealth of Virginia. Nova Datacom was a provider of information assurance and security services to federal agencies and commercial companies.

4. I started and controlled Nova Datacom.

5. I made my sister, Min Cho, Nova Datacom's CEO at the end of 2006 or at the beginning of 2007 to qualify Nova Datacom for 8(a) status under the Small Business Associations guidelines, but I continued to make or approve Nova Datacom's significant financial decisions and I possessed dominion and control over Nova Datacom's assets. I disclosed this information concerning my true ownership and control of Nova Datacom to Mr. McCool at the outset of his representation of me in 2011, and to the government during debriefings of me that occurred in 2011 as part of my cooperation with the government.

6. On October 19, 2009, I formed ASSUREIT, LLC in the Commonwealth of Virginia.

7. ASSUREIT generally sold used computer/telecommunications equipment.

8. I was the sole member and owner of ASSUREIT. I operated ASSUREIT as a sole proprietorship.

9. I possessed full dominion, control, and ownership over ASSUREIT's assets. I disclosed this information about my ownership of ASSUREIT to Mr. McCool in 2011, during his representation of me.

10. In February 2011, I hired Steven McCool of Mallon & McCool, LLC to represent me in
    connection with an investigation of Nova Datacom's government contracting practices.

11. On February 26, 2011, I signed a fee agreement for Mallon & McCool to provide me legal
    services.

12. On about February 28, 2011, I provided Mallon & McCool $10,000.00 to serve as a retainer
    for the firm's representation of me. I provided a $10,000.00 payment using a check from
    Nova Datacom. While the payment came from Nova Datacom, the $10,000.00 from Nova
    Datacom came at my direction and was returnable to me for my use if not properly earned by
    Mr. McCool and Mallon & McCool to fund my legal representation.

13. After signing the fee agreement and providing the initial $10,000.00 as a retainer deposit to
    Mr. McCool, I provided Mr. McCool with an additional $200,000.00 check to fund his
    representation of me. Upon information and belief, I provided Mr. McCool with a cashier's
    check from SunTrust Bank. I obtained the cashier's check on about March 2, 2011 by
    withdrawing $200,000.00 from my ASSUREIT account at SunTrust Bank. This occurred
    during the first week of March, 2011. A copy of the check I wrote on my ASSUREIT
    account to withdraw the $200,000.00 used to purchase the cashier's check I provided to Mr.
    McCool is attached as Exhibit 1.

14. By March 4, 2011, I was already cooperating with the government, participating in
    debriefings and undercover operations. Mr. McCool knew I would be pleading guilty as part
    of my cooperation and he was discussing with me both the charges to which I would likely
    be pleading guilty and the time I was likely to receive. Mr. McCool knew my case would
    resolve through a plea and he assured me, before I provided additional funds to be deposited

into his firm's escrow account, that the $210,000.00 retainer I had already provided was adequate to fund my legal representation through sentencing.

15. On about May 11, 2011, I caused Nova Datacom to provide Mallon & McCool a payment of $250,000.00. On about June 28, 2011, I caused Nova Datacom to provide Mallon & McCool a second payment of $250,000.00. Both the May 11th and June 28th payments were paid with funds drawn on Nova Datacom's bank account. I directed my sister to cause these additional funds to be paid to Mallon & McCool. Before doing so, Mr. McCool and I discussed whether he would agree to accept these funds into his firm's escrow account so that I could move these funds out of Nova Datacom for my later use. I told him that I wanted to make sure I had enough money to hire immigration counsel after my sentencing and to provide for my family during my anticipated incarceration. Mr. McCool agreed to accept these funds and retain them in his escrow account for that purpose. At the time of these discussions, in May and June 2011, Mr. McCool was advising me to expect a sentence of between eighteen and thirty-six months. Understanding the $500,000.00 funds from Nova Datacom belonged to me, Mr. McCool agreed to return these additional funds directly my wife after my sentencing.

16. The May 11th and June 28th transfers to Mallon & McCool were not intended for Mallon & McCool's legal fees.

17. On December 21, 2012, at Mr. McCool's direction, I signed a check made payable to Mallon & McCool for $142,336.15 and drawn on ASSUREIT's Sun Trust Bank account. Mr. McCool told me the check was to cover a $125,000.00 payment to the government towards forfeiture as substitute assets he said I owed and $17,336.14 in legal fees that Mr. McCool said I owed. He told me then that my retainer was exhausted. When Mallon & McCool said I

owed the firm $17,336.14, the firm had not provided me documents to show why my account was in arrears or how the retainer had been exhausted. I did not know the $500,000.00 the firm agreed to hold for me had been depleted, too. Mr. McCool understood that the ASSUREIT money he was asking me to relinquish to him in 2012 belonged to me. He told me he would ask the Assistant United States Attorney if $3,500.00 of the ASSUREIT funds could be transferred to my wife for her use.

18. While the February 26, 2011 fee agreement I signed indicates Nova Datacom would pay my legal fees, Nova Datacom's untainted funds were my funds. I controlled the money I provided and caused Nova Datacom to provide to Mr. McCool and Mallon & McCool. The funds were untainted, and the bulk of the funds I paid to Mallon & McCool for potential use as legal fees—the $200,000.00 I paid in March 2011 and the $17,336.14 he said he was deducting from the $142,336.15 check I wrote to Mallon & McCool in 2012--actually came from ASSUREIT, not Nova Datacom.

\* \* \*

Pursuant to 28 U.S.C. § 1746, I, Young N. Cho, declare under penalty of perjury that the foregoing is true and correct. Executed on ___April 25, 2016___
                                                                    Date

_Young N. Cho_

# Exhibit 1

**Check Image Print**

User ID: UDAD2                                                    Date: 04/20/2016
Report ID: Check Image Print                                      Time: 11:59:56

| Capture Date | Sequence Number | Check Number | Amount | Posting Date | Posting Account |
|---|---|---|---|---|---|
| 20110302 | 31114833 | 80 | 200000.00 | 20110302 | 1000098932550 |





Plaintiff's Exhibit 2

Declaration of Steven J. McCool

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Case No. 11-cr-00267 (EGS) |
| ) | |
| v. ) | |
| ) | |
| YOUNG N.CHO, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DECLARATION OF STEVEN J. MCCOOL

1.    I, Steven J. McCool, am over 18 years of age and am competent to testify.

2.    In late February 2011, I met Mr. Young N. Cho, also known as Alex Cho, for the first time. I am a criminal defense attorney and Mr. Cho was looking to hire one. Shortly after our initial meeting, Mr. Cho hired my law firm to represent him in what became this pending criminal matter. My firm continued to represent him until early 2013. By email dated December 31, 2014, Mr. Cho's current attorney, William Cowden, sent a declaration for my review and signature. Upon request, on January 3, 2014, Mr. Cho and Mr. Cowden executed a waiver of attorney-client privilege, work-product doctrine and written consent to disclosure ("waiver"). This waiver is attached to this declaration.

3.    In early March 2011, Mr. Cho began to debrief with law enforcement officers and prosecutors from the United States Attorney's Office for the District of Columbia ("USAO") about his knowledge of and involvement in bribery involving various government contractors and officials at the U.S. Army Corps of Engineers ("USACE") who administered certain USACE contracts.

4.    Beginning in early March 2011, and continuing until the government disclosed its investigation through execution of search warrants and public arrests of USACE officials in or about October 2011, Mr. Cho cooperated in an undercover capacity with the government in its investigation into bribery involving USACE employees and USACE contractors. During his cooperation, Mr. Cho debriefed extensively and engaged in numerous recorded conversations with numerous targets and subjects of the government's USACE contracting investigation. Mr. Cho continued to cooperate in a non-undercover capacity after October 2011.

5.    Mr. Cho did not start cooperating with the government pursuant to the terms of a plea agreement. Instead, while he was cooperating, Mr. Cowden, who was working with me on this matter at the time, and I engaged in plea discussions with prosecutors at the USAO. On numerous occasions from March through September 2011, I spoke with and communicated by email with USAO prosecutors Michael Atkinson and Bryan Seeley. Mr. Cho's primary concerns, which I expressed to the government during ongoing plea negotiations, were (1) reducing his exposure to incarceration while maintaining his ability to remain in this country with his family, and (2) eliminating his financial responsibility to the government by repaying all of the overhead he, his

SSM
1-6-14

sister and Nova Datacom retained, and by assisting the government in tracing dirty funds and seizing tainted assets that others received. "Overhead" is a term the government used during plea negotiations, which the prosecutors defined as money included in contracts that was promised but not paid out as bribes and were under Mr. Cho's, his sister's or Nova Datacom's control.

6.     On about August 22, 2011, while plea discussions were ongoing, Mr. Cowden and I met with Ron Machen and Tom Hibarger at the USAO to discuss, primarily, Mr. Cho's post-conviction immigration status.

7.     During this August 2011 meeting at the USAO, I indicated that Mr. Cho was concerned about how his eventual guilty plea would impact his ability to remain in this country with his family. (Mr. Cho's wife and his two children are U.S. citizens, but Mr. Cho is not.) After speaking with Mr. Machen and Mr. Hibarger, I understood that, if Mr. Cho adhered to his obligations under the eventual plea agreement, at the time of Mr. Cho's sentencing, Mr. Machen would make Mr. Cho's cooperation known to the Director of U.S. Immigration and Customs Enforcement ("ICE") or a high-ranking ICE official and, if appropriate, request that ICE defer action on Mr. Cho's removal.

8.     With respect to the forfeiture issues in this case, it is my recollection that the government agreed only to forfeit monies that Mr. Cho, his sister, Min Cho and Nova Datacom retained, and that it would not seek to hold Mr. Cho responsible for money paid to Kerry Khan or other targets of its investigation. My recollection is supported, in part, by the following. During the course of our representation of Mr. Cho, he delivered a large amount of cash to me at my office. I immediately notified the prosecutors handling this case. After FBI agents seized the cash, a portion of those proceeds was given, with the consent of the prosecutors, to Mr. Cho's wife, because it was not directly tied to criminal activity. It was not seized as substitute assets. Also, after securing separate counsel for Mrs. Cho, my partner, Joe Mallon negotiated the resolution of a civil judgment against Mr. and Mrs. Cho, on Mr. Cho's behalf, under which the government received a percentage of the profits from the sale of Mr. Cho's home, the claimant received a percentage, and Mrs. Cho received the remainder. The monies received by Mrs. Cho were not seized as substitute assets. With respect to the forfeiture issue, it is also my recollection that Mr. Cho was to receive credit for taxes paid on the overhead amounts he had previously retained.

9.     In November 2011, the government requested that Mr. Cho be detained pending sentencing. The government alleged that Mr. Cho might not receive credit for having provided substantial assistance to the government, because the government learned on or about November 2, 2011, through Thomas Kwon and/or his attorney, that Mr. Cho had previously signaled to Mr. Kwon that Mr. Cho was wearing a recording device. The government said then that this conduct amounted to obstruction of justice, and it formed the basis of its motion to change Mr. Cho's bond status. Although the Court invited Mr. Cho to move for reconsideration of its decision to detain him pending his sentencing, the government told me that it would move for Mr. Cho's immediate sentencing should Mr. Cho request reconsideration.



10.      After Mr. Cho's bond was revoked in November 2011, Mr. Machen told me that he did not intend reach out to the Director of ICE to assist Mr. Cho with his immigration status, because Mr. Cho had violated the terms of the plea agreement.

* * *

I declare under penalty of perjury that the foregoing is true and correct to the best of my present recollection.  Executed on January 5, 2014.

1-6-14

Steven J. McCool

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 11-cr-267 (EGS) |
| YOUNG N. CHO, also known | ) | The Honorable Emmett G. Sullivan |
| as, ALEX N. CHO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## WAIVER OF ATTORNEY-CLIENT PRIVILEGE, WORK-PRODUCT PROTECTION AND WRITTEN CONSENT TO DISCLOSURE

1. I, Young N. Cho, (*aka* Alex N. Cho), had previously retained Steven J. McCool, his partners, associates, agents, and Mallon & McCool, LLC (collectively herein "the law firm") to represent me in the above-captioned case and on other legal matters.

2. I understand that I had an attorney-client relationship with Mr. McCool and others associated with the law firm.

3. I understand that the "attorney-client privilege" is designed to protect communications (made for the purpose of seeking, obtaining or providing legal assistance) between me and the law firm from disclosure to third parties.

4. I understand that the "work product privilege" is designed to protect documents and tangible things prepared by the law firm in anticipation of litigation or for trial from disclosure to third parties.

5. I understand that I am the holder of the attorney-client privilege, and I maybe be the holder of the attorney-work product privilege.

6. I hereby expressly waive and fully authorize Mr. McCool and anyone associated with the law firm to disclose any communications or work product that could be deemed to be privileged.

1

7. I represent that there was no force or threat to me by anyone for me to prepare and sign this waiver of confidentiality and consent to disclose any communications or work product that could be deemed to be privileged.

8. I hereby agree that I will not, directly or indirectly, seek to hold Mr. McCool or anyone associated with him or the law firm, whether during or after the attorney-client relationship, liable for disclosing and/or discussing confidential and/or privileged communications or work product upon the execution of this waiver agreement.

9. I hereby acknowledge that I have been advised to seek independent counsel advice on this waiver agreement before execution, and have done so or waived the opportunity to seek independent counsel advice in connection with this waiver.

AGREED & ACCEPTED:

_____
Young N. Cho
(aka Alex N. Cho)

_____
William R. Cowden
Counsel for
Young N. Cho
(aka Alex N. Cho)

1/3/2014
_____
Date

1/3/2014
_____
Date

Plaintiff's Exhibit 3

June 22, 2011 Fee Agreement

# MALLON & McCOOL, LLC
1776 K STREET, N.W., SUITE 200
WASHINGTON, D.C. 20006

Tel: 202-393-7088

Fax: 202-293-3499

June 22, 2011

BY HAND

Alex Cho
770 Strawfield Lane
Great Falls, VA 22066

Re:   Fee Agreement for Legal Services

Dear Mr. Cho:

On February 26, 2011, Mallon & McCool, LLC agreed to represent you in connection with an investigation of Nova Datacom, LLC's ("NDC") government contracting practices by the Office of the United States Attorney for the District of Columbia ("USAO"). Since that time, as you know, the USAO has expanded its investigation of you and NDC. The terms and conditions under which we propose to represent your interests in this new matter are set forth below.

Our services are charged based upon the number of hours expended by the attorney or paralegal at their hourly rates. Our hourly rate for partners is $550.00. As of June 1, 2011, we will no longer bill you at a reduced hourly rate of $400.00 in this matter. Instead, we will bill you at $550.00 per hour for partners. We will, however, continue to bill associates at a rate of $250.00 per hour. Our rate for paralegal assistants will also remain at $75.00 per hour.

We understand that Nova Datacom, LLC ("NDC") will pay our fees, as well as costs and expenses we may incur in representing you, such as copying, postage, messenger service, cab fares, telephone, facsimile, travel expenses, court costs and fees for expert witnesses, investigators and other support services. We further understand that NDC has provided a retainer, and, as of June 1, 2011, $296,845 remains in our escrow account. We have asked NDC to provide an additional retainer in the amount of $250,000. This amount will be deposited into my law firm's attorney-client trust account. We further understand that NDC has agreed to pay directly for any additional legal fees and expenses, beyond the retainer amount, as they come due each month. This presents a potential conflict. Your interests and the interests of NDC may diverge at some point. Therefore, we are advising you that we only represent your interests under this Agreement. We will not allow the source of payment for our services to affect adversely our legal advice to you. If you believe that we will not represent your interests solely, you may terminate this Agreement and retain an attorney paid by you. It is understood, however, that, when it serves your interests in this matter, we will receive and provide information to

Alex Cho
June 22, 2011
Page 2 of 2

attorneys for NDC and/or attorneys for current or former employees of NDC.

You and NDC will receive invoices for services rendered and expenses incurred. Should NDC fail to pay our fees, costs and/or expenses, you agree to make these payments. Nonpayment of an invoice over the retainer amount when due will constitute your consent to our withdrawal from this matter.

It is understood that the amount payable shall cover the professional services described above. Should professional services be required in any other matter or proceeding, an additional charge will be made on a time-expended basis at the hourly rates applicable at the time such services are rendered.

It is understood that you have the right at any time, in your sole judgment, to terminate this Agreement by written notice (along with your signed consent to our withdrawal as counsel for you in any pending matter) and to obtain a new attorney. In the event of discharge, we will be entitled to collect fees and expenses then assessed against your account.

This letter sets forth completely the terms of our Agreement, and there are no other agreements, promises or understandings not set forth herein.

Please sign and return the enclosed copy of this letter, indicating your acceptance and understanding of the terms of the representation. If you have questions with respect to this Agreement or with respect to any aspect of our billing practices, please call me.

Please understand that unless this Agreement is signed and received by the firm no further work can be done in connection with your matter.

Sincerely,

/s/

Steven J. McCool

AGREED & ACCEPTED:

_____
Alex Cho

_____
6/22/2011
Date

Plaintiff's Exhibit 4

January 4, 2013 Letter from Mr. McCool to Mr. Cho

### MALLON & McCOOL, LLC
1776 K STREET, N.W., SUITE 200
WASHINGTON, D.C. 20006

Tel: 202-393-7088                                                                   Fax: 202-293-3499

January 4, 2013

**BY HAND**

Alex Cho

> Re:   *United States v. Young N. Cho*, Criminal No. 11-267 (EGS)

Dear Alex:

As we discussed, the funds in your ASSUREIT LLC Sun Trust Bank account are subject to forfeiture as substitute assets in the above-captioned case.

As of October 31, 2012, $142,336.15 remains in this account. The United States has agreed to accept $125,000 from this account as substitute assets payable towards your forfeiture in this case, with the understanding that the remainder ($17,336.15) will be used to pay legal fees that you have already incurred. I have included copies of invoices dated December 1, 2012 and January 1, 2013 for your review. As I previously stated, even though you are still in arrears, I will continue to represent you through your sentencing in this case even if you are unable to pay for these legal services. I have also agreed to ask AUSA Atkinson if $3,500 from the $17,336.15 can be transferred to your wife Amy Cho. If not, the entire $17,336.15 will go towards legal fees.

If you agree with contents of this letter, please sign the enclosed check and a copy of this letter. I will deposit this check in my escrow account and, once it clears, I will write a check to the United States in the amount of $125,000 and I will move the remainder to my operating account.

Please do not hesitate to contact me if you have any questions concerning the contents of this letter or any other matter connected with this case.

Sincerely,

Steven J. McCool

AGREED & ACCEPTED:

Alex Cho/Date

Plaintiff's Exhibit 5

Mr. McCool May 17, 2013 Letter to Ms. Van Gelder



**MALLON &**
**McCOOL**
ATTORNEYS AT LAW

1776 K. Street, NW › Suite 200
Washington, DC 20006
TEL 202.393.7088 ›FAX 202.293.3499

www.MallonandMcCool.com

May 17, 2013

<u>BY ELECTRONIC TRANSMISSION & U.S. MAIL</u>

Barbara Van Gelder
Dickstein Shapiro
1825 Eye Street, NW
Washington, DC 20006

   Re:  *Indemnification of Young N. Cho*

Dear Ms. Van Gelder:

  As you know, NovaDatacom agreed to indemnify Mallon & McCool, LLC for legal services provided to Young N. Cho in *United States v. Young N. Cho*, Criminal No. 11-267 (EGS). On February 28, 2013, I sent to you an invoice showing an outstanding balance of $44,316.91.

  I understand the United States has restrained any assets NovaDatacom has and will restrain any funds NovaDatacom may receive in the future. Notwithstanding, I have reviewed my invoices in this matter, and I am writing to inform you of the following:

  In May 2011, my hourly rate should have been $400, instead of the $550 that was charged. In December 2011, January, February and April 2012, Mark Henckel and Marshall Perkins were billed at an hourly rate of $275. They should have been billed at the associate's rate of $250 per hour. I have also noted some discrepancies in my notes and the invoiced hours. Even if all of these adjustments are made in NovaDatacom's favor, the amount owed by NovaDatacom to Mallon & McCool, LLC is still $6,644.41. Moreover, I have also noted over 100 instances where I failed to bill for telephone calls with Mr. Cho, his wife and the prosecutor in this case. I also failed to bill for meetings and other work. I have not supplemented my final invoice at this point, as, again; I understand that NovaDatacom is insolvent.

  If you have any questions, please feel free to contact me at 202-680-2440.

     Sincerely,

     Steven J. McCool

cc: William Cowden

Plaintiff's Exhibit 6

M&M, LLC March 2011 Billing Entries

Alex Cho:

| | | |
|---|---|---|
| 2/26/11 | .8 | Draft retainer agreement; Email client |
| 3/1/11 | 6.1 | Client meeting |
| 3/2/11 | 9.3 | Client meeting; Review subpoena; Draft memorandum to file; Telephone AUSA Conor; Telephone AUSA Atkinson; Telephone SA Knowles; Telephone SA Childs |
| 3/3/11 | 11.5 | Client meeting; Draft memorandum to file; Meeting at USAO with AUSAs Conor, Atkinson, Durham, Agents Arp (SBA) and SA Greenberg |
| 3/3/11 (Cowden) | 3.6 | Meeting at USAO |
| 3/4/11 | 3.8 | Client meeting; Meeting with Greenberg and Arp; Telephone client; Text client |
| 3/7/11 | 5.6 | Meeting with Pat Woodward, Min Cho, client and Phil Livingston; Client meeting; Telephone Atkinson; Email Atkinson; Telephone client |

# Mallon & McCool, LLC

36 South Charles Street, Suite 2310
Baltimore, Maryland 21201
Tel: (410) 727-7887  Fax: (410) 727-4770

1776 K. Street, N.W., Suite 200
Washington, D.C. 20006
Tel: (202) 393-7088  Fax: (202) 293-3499

Alex Cho                                                                                     March 31, 2011

Invoice submitted to:
Nova Datacom, LLC

Matter No. 134-1
Re: Nova Datacom, LLC Investigation

## Billing Summary

| | |
|---|---|
| Previous Balance | $0.00 |
| Payments & Adjustments | 0.00 |
| New Fees | 65,400.00 |
| New Expenses | 0.00 |
| Retainer Applied | 65,400.00 CR |
| **Balance Due:** | **$0.00** |
| Retainer balance | $144,600.00 |

| Professional Services | | | Hours | Amount |
|---|---|---|---|---|
| 02/25/11 | SJM | Meeting with client and P. Woodward. | 6.10 $400.00/hr | $2,440.00 |
| 02/26/11 | SJM | Draft retainer agreement; Email client. | 0.80 $400.00/hr | $320.00 |
| 03/01/11 | SJM | Client meeting. | 6.10 $400.00/hr | $2,440.00 |
| 03/02/11 | SJM | Client meeting; Review subpoena; Draft memorandum to file; Telephone AUSA Conor; Telephone AUSA Atkinson; Telephone SA Knowles; Telephone SA Childs. | 9.30 $400.00/hr | $3,720.00 |
| 03/03/11 | WRC | Discussions with S. McCool re: strategy; Meeting with A. Cho, S. McCool, DOJ and | 3.00 $400.00/hr | $1,200.00 |

Nova Datacom, LLC Investigation

March 31, 2011
Page 2

|  |  | Agents to discuss case status. |  |  |
|---|---|---|---|---|
| 03/03/11 | SJM | Client meeting; Draft memorandum to file; Meeting at USAO with AUSAs Conor, Atkinson, Durham, Agents Arp (SBA) and SA Greenberg. | 11.50 $400.00/hr | $4,600.00 |
| 03/03/11 | WRC | Meeting at USAO. | 3.60 $400.00/hr | $1,440.00 |
| 03/04/11 | SJM | Client meeting; Meeting with Greenberg and Earp; Telephone client; Text client. | 4.20 $400.00/hr | $1,680.00 |
| 03/05/11 | SJM | Review immigration documents; Research S Visa guidelines. | 4.60 $400.00/hr | $1,840.00 |
| 03/07/11 | SJM | Meeting with Pat Woodward, Min Cho, client and Phil Livingston; Client meeting; Telephone Atkinson; Email Atkinson; Telephone client. | 6.10 $400.00/hr | $2,440.00 |
| 03/08/11 | SJM | Client meeting; Draft and revise memorandum to file; research and obtain docket sheet of Yuem Ming Chen (Austin Chan). | 6.20 $400.00/hr | $2,480.00 |
| 03/09/11 | SJM | Client meeting; Research immigration issues; Meeting with AUSA Atkinson and Seeley and Agents Greenberg and Earp. | 8.20 $400.00/hr | $3,280.00 |
| 03/09/11 | WRC | Interview client re: forfeiture issues. | 1.10 $400.00/hr | $440.00 |
| 03/10/11 | SJM | Emails to and from client; Client meeting; Review documents and notes. | 2.10 $400.00/hr | $840.00 |
| 03/11/11 | SJM | Telephone J. Greenberg; Telephone client; Review memorandum and documents. | 1.50 $400.00/hr | $600.00 |
| 03/13/11 | SJM | Telephone client. | 0.10 $400.00/hr | $40.00 |
| 03/14/11 | WRC | Meeting with client to discuss facts; telecon with USAO DC forfeiture unit. | 4.50 $400.00/hr | $1,800.00 |

Nova Datacom, LLC Investigation                                    March 31, 2011
                                                                          Page 3

| 03/14/11 | SJM | Telephone M. Atkinson; Client meeting; Research immigration issues. | 3.10 $400.00/hr | $1,240.00 |
|---|---|---|---|---|
| 03/15/11 | SJM | Research K. Khan, M. Alexander, H. Babb, Ananke and related companies. | 2.40 $400.00/hr | $960.00 |
| 03/16/11 | SJM | Telephone client; Research immigration issues. | 4.10 $400.00/hr | $1,640.00 |
| 03/17/11 | SJM | Client meeting; Meeting with M. Atkinson, B. Seeley, J. Greenberg, H. Earp. | 3.60 $400.00/hr | $1,440.00 |
| 03/17/11 | WRC | Client meeting. | 2.50 $400.00/hr | $1,000.00 |
| 03/18/11 | SJM | Review documents; Client meeting; Meeting with M. Atkinson, B. Seeley, J. Greenberg, H. Earp. | 9.10 $400.00/hr | $3,640.00 |
| 03/19/11 | SJM | Review documents provided by client. | 4.20 $400.00/hr | $1,680.00 |
| 03/20/11 | SJM | Review documents provided by client. | 3.40 $400.00/hr | $1,360.00 |
| 03/21/11 | SJM | Telephone Biz Van Gelder and Pat Woodward; Telephone M. Atkinson; Review documents. | 1.40 $400.00/hr | $560.00 |
| 03/22/11 | SJM | Client meeting; Meeting with M. Atkinson, B. Seeley, J. Greenberg, H. Earp. | 4.50 $400.00/hr | $1,800.00 |
| 03/23/11 | SJM | Client meeting; Meeting with W. Cowden; Research potential fraud issue (phantom employees); Draft memorandum to file. | 9.60 $400.00/hr | $3,840.00 |
| 03/23/11 | WRC | Client meeting; Meeting with S. McCool. | 3.10 $400.00/hr | $1,240.00 |
| 03/24/11 | SJM | Meeting with M. Atkinson, B. Seeley and W. Cowden; Telephone client; Meeting with W. Cowden; Telephone client; Email client. | 3.60 $400.00/hr | $1,440.00 |
| 03/24/11 | WRC | Meeting at USAO with S. McCool, M. Atkinson and B. Seeley; Telephone D. Conor; Meeting | 3.60 $400.00/hr | $1,440.00 |

Nova Datacom, LLC Investigation                                    March 31, 2011
                                                                        Page 4

with S. McCool.

| Date | Initials | Description | Hours/Rate | Amount |
|---|---|---|---|---|
| 03/24/11 | WRC | Meeting with M. Atkinson, B. Seeley and S. McCool; Meeting with McCool; Telephone D. Conor. | 3.90 $400.00/hr | $1,560.00 |
| 03/25/11 | SJM | Telephone client; Telephone J. Greenberg; Telephone M. Atkinson; Research debarment issues. | 4.30 $400.00/hr | $1,720.00 |
| 03/28/11 | SJM | Client meeting; Meeting with client and O. Johnson; Client meeting; Telephone M. Atkinson; Telephone J. Greenberg; Telephone client. | 5.10 $400.00/hr | $2,040.00 |
| 03/29/11 | SJM | Telephone client; Telephone J. Greenberg; Review consent form; Telephone J. Greenberg; Telephone client. | 2.10 $400.00/hr | $840.00 |
| 03/29/11 | WRC | Review consent form; Meeting to discuss with S. McCool. | 0.60 $400.00/hr | $240.00 |
| 03/30/11 | SJM | Telephone M. Atkinson, Telephone J. Greenberg, Telephone client; Meeting at USAO; Client meeting; Telephone client. | 5.20 $400.00/hr | $2,080.00 |
| 03/30/11 | WRC | Meeting at USAO; Client meeting. | 4.90 $400.00/hr | $1,960.00 |
| 03/31/11 | SJM | Telephone client. | 0.20 $400.00/hr | $80.00 |

Hours:                    163.50
Total Fees:                            $65,400.00

Attorney/ Paralegal Summary

SJM    Steven J. McCool        132.70 hours at $400.00 per hour
WRC    William R. Cowden        30.80 hours at $400.00 per hour

**Retainer:**

02/28/11    Retainer.                                      $210,000.00

Nova Datacom, LLC Investigation

March 31, 2011
Page 5

---

PLEASE REMIT PAYMENT TO:

MALLON & McCOOL, LLC
36 SOUTH CHARLES STREET, SUITE 2310
BALTIMORE, MARYLAND  21201

Plaintiff's Exhibit 7

Caplin & Drysdale Letter

202-862-5024 Direct
nkochman@capdale.com

January 6, 2012

*Via Federal Express*

Young N. Cho
c/o Joseph T. Mallon, Jr., Esq.
Mallon & McCool, LLC
36 South Charles Street
Suite 2310
Baltimore, MD 21201

Dear Mr. Cho:

Our firm policies generally require us to write a letter confirming the conclusion of an engagement with a client. This helps us prevent conflicts of interest between current clients and provides a clear point after which our attorney-client relationship has terminated. The D.C. Rules of Professional Conduct also attach certain consequences to the end of such a relationship, such as requirements for the return of any property held in trust and the time period for which we must retain your files.

We have not billed any time to this engagement since December 13, 2011, and there appears to be no requirement for any further work on it. Accordingly, as of this date we will consider this engagement to be completed. We are therefore returning to you the amount of $10,826.00, which is the full amount held in our trust account in your name. With respect to files, our firm policy is that we will retain our files for a period of five years starting now, at the end of which, in the absence of a specific direction to the contrary from you, we will destroy them.

#557821

- 2 -

Caplin & Drysdale would of course welcome the opportunity to provide you with further legal representation on other issues in the future. Please do not hesitate to call on us if we can be of any assistance.

Very truly yours,

CAPLIN & DRYSDALE, CHARTERED


By: _____
Neal M. Kochman

NMK/jk
Enclosure - Check No. 044345

# Mallon & McCool, LLC

300 E. Lombard Street, Suite 815
Baltimore, Maryland 21202
Tel: (410) 727-7887  Fax: (410) 727-4770

1776 K. Street, N.W., Suite 200
Washington, D.C. 20006
Tel: (202) 393-7088  Fax: (202) 293-3499

Alex Cho                                                              February 29, 2012

Invoice submitted to:
Alex Cho

Matter No. 134-1
Re: Nova Datacom, LLC Investigation

**Billing Summary**

| | |
|---|---|
| Previous Balance | $0.00 |
| Payments & Adjustments | 0.00 |
| New Fees | 16,352.50 |
| New Expenses | 15,149.95 |
| Retainer Applied | 31,502.45 CR |
| **Balance Due:** | **$0.00** |
| Retainer balance | $136,493.05 |

| Professional Services | | | Hours | Amount |
|---|---|---|---|---|
| 02/01/12 | JTM | Telephone call with JJ from IRS | 0.10 $550.00/hr | $55.00 |
| 02/02/12 | SJM | Status hearing | 1.40 $550.00/hr | $770.00 |
| 02/03/12 | JF | Review plea agreement/sentencing materials | 2.00 $75.00/hr | $150.00 |
| 02/08/12 | SJM | Email Greenberg; Telephone call with Greenberg; Meeting with Greenberg; Email Bobby Kang | 0.40 $550.00/hr | $220.00 |
| 02/09/12 | MSH | Email Superintendant Hall re: status of commissary funds and closing | 0.20 $275.00/hr | $55.00 |

Nova Datacom, LLC Investigation

February 29, 2012
Page 2

| Date | Init. | Description | Hours / Rate | Amount |
|---|---|---|---|---|
| 02/09/12 | SJM | Review BVG email | 0.30 $550.00/hr | $165.00 |
| 02/09/12 | SJM | Review notes and memoranda | 2.70 $550.00/hr | $1,485.00 |
| 02/10/12 | SJM | Travel to DC Jail; Client Meeting | 3.60 $550.00/hr | $1,980.00 |
| 02/11/12 | SJM | Email Anna Gallagher | 0.30 $550.00/hr | $165.00 |
| 02/13/12 | MNP | Cnf. - JM (legal research - tax matters - innocent spouse defense, etc.), w/ mnp notes | 0.10 $275.00/hr | $27.50 |
| 02/14/12 | MNP | Cnf. - JM (2/14 Amy Cho call).  Teleconf:  JM & Amy C. (various tax matters; her interaction w/ IRS; obtaining documents; etc.).  Telecnf:  JM & Joe T. (status, draft Release for property matter, re: Amy C.) | 0.40 $275.00/hr | $110.00 |
| 02/14/12 | JTM | Cnf. - Mnp (2/14 Amy Cho call).  Teleconf: Amy C. & Mnp (various tax matters; her interaction w/ IRS; obtaining documents; etc.). Telecnf: Joe T. & Mnp (status, draft Release for property matter, re: Amy C.) | 0.40 $550.00/hr | $220.00 |
| 02/16/12 | SJM | Email Mark Henckel | 0.30 $550.00/hr | $165.00 |
| 02/17/12 | SJM | Travel to and from CTF; Meeting with client | 1.90 $550.00/hr | $1,045.00 |
| 02/17/12 | JF | Travel to and from CTF; Meeting with client | 1.90 $75.00/hr | $142.50 |
| 02/17/12 | MNP | Legal research (tax law - innocent spouse relief; including S.Ct., 4th Cir., D. Va., other federal cases; 26 U.S.C. 6015(b), (c), & (f), and citing cases) | 3.80 $275.00/hr | $1,045.00 |
| 02/17/12 | SJM | Review notes and memoranda | 1.80 $550.00/hr | $990.00 |

Nova Datacom, LLC Investigation

February 29, 2012
Page 3

| | | | | |
|---|---|---|---|---|
| 02/20/12 | JTM | Telephone call w/AC; Email to MH; Review Innocent Spouse Memorandum | 1.10 $550.00/hr | $605.00 |
| 02/20/12 | MNP | Draft Legal Memo to JM (re: Innocdent Spouse Relief, generally), and accompanying research; edit document.  1st read-through, Legal Memo, with mnp notes / research; check / edit.  2nd read-through / quote-check, Legal Memo, with mnp notes / research; check / edit.  Scan statute and cover email to JM, w/ same, draft Memo | 3.60 $275.00/hr | $990.00 |
| 02/21/12 | JTM | Conf. with MP; Telephone call with AC; Email to AC; Review memorandum | 0.70 $550.00/hr | $385.00 |
| 02/21/12 | MNP | Cnfs. - JM (tax issues, contacting Amy Cho). Telecnf.:  Amy Cho & JM (same; AC obtaining, forwarding tax-related documents), w/ mnp notes.  Cnf. - JM (scheduled 2/22 District Heights foreclosure sale), w/ mnp notes; internet research (same sale) and additional notes; cnf. - JM (indicated postponement?, 2/22 sale); voicemail to Michael Bolesta (same).  Tel call - Michael Bolesta (cancellation of 2/22 foreclosure); confirmatory email to MB (same); follow-up email to SM / JM | 0.80 $275.00/hr | $220.00 |
| 02/22/12 | MNP | Cnfs. - JM (factual background - tax issues; contacting Amy Cho, re: same and documents). Addtiional file research - factual background - tax issues.  Legal research - liability, filing separately; begin draft Legal Memo (same) | 1.20 $275.00/hr | $330.00 |
| 02/23/12 | MNP | Legal research - liability, filing separately, including liability, collection against non-culpable spouse.  Continue to draft Legal Memo (same).  File research, including factual matters; prep for Amy Cho call; tel call - Amy C. (requested documents; tax matters); follow-up email to Amy C.  1st read-through, Legal Memo (Married filing separately), w/ Mnp notes; edit / check same. 2nd read-through /quote-check, Legal Memo (Married filing separately), w/ Mnp notes; edit / check same.  Cover email to JM; cnf. - JM (his review, 2/23 Memo; add'l Mnp | 2.80 $275.00/hr | $770.00 |

Nova Datacom, LLC Investigation

February 29, 2012
Page 4

research, 2/24)

| Date | Initials | Description | Hours / Rate | Amount |
|---|---|---|---|---|
| 02/24/12 | MNP | Review Amy Cho email, and attached docs (including Amy C. tax return). Continuing legal research - liability, filing separately, including liability, collection against non-culpable spouse (including cases citing S.Ct. Rodgers case). Tel call - JM (status, 2/24 research). Continue to revise, draft, edit Legal Memo (same issues); cover email to JM | 2.70 $275.00/hr | $742.50 |
| 02/26/12 | JTM | Review fedex from Amy Cho; email to MP | 0.60 $550.00/hr | $330.00 |
| 02/27/12 | MNP | Reivew JM email (draft IRS, Married filing separately memo). Cnf. - JM (same; tax docs forwarded by Amy C.; 2/27 cnf., same matters). Review various documents forwarded by Amy C.; mnp notes - same. Cnf. - Irina (re: same docs - filing non-tax documents). Cnfs. - JM (additional facts - newly produced docs, including 2009 deficiency; drafting 3/1 letter for Alex C.'s review, related matters), w/ mnp notes | 0.70 $275.00/hr | $192.50 |
| 02/27/12 | JTM | Conf. w/MP; Review file | 0.80 $550.00/hr | $440.00 |
| 02/27/12 | MSH | Email from and to North Neck Regional Jail re: commissary funds/clothing | 0.10 $275.00/hr | $27.50 |
| 02/27/12 | MSH | Review email from NNRJ re: founds and clothing; Email to NNRJ supplying identification information re: AC; Review email from NNRJ re: clint identification | 0.30 $275.00/hr | $82.50 |
| 02/28/12 | MNP | Review JM email, with attached Amy C. email / copy of check. File research, and draft / edit JM 3/1 letter to client (summarizing various tax issues, the "Client Tax Letter"). 1st read-through, Client Tax Letter, w/ mnp notes; edit / check. 2nd read-through / quote-check, Client Tax Letter, w/ mnp notes; edit / check. File research, and draft / edit Joe T. letter to IRS (addressing Amy C. tax isues, the "Tivvis Tax Letter"). 1st | 2.80 $275.00/hr | $770.00 |

Nova Datacom, LLC Investigation                              February 29, 2012
                                                                      Page 5

|            |     | read-through, Tivvis Tax Letter, w/ mnp notes |                |           |
|------------|-----|-----------------------------------------------|----------------|-----------|
| 02/28/12   | SJM | Email AUSA Atkinson                           | 0.20 $550.00/hr | $110.00  |
| 02/29/12   | MNP | Cnf. - JM (status, drafting tax-related letters). Edit "Tivvis Tax Letter" (including re: Mnp written comments, 2/28 review). 2nd read-through / quote-check, Tivvis Tax Letter, w/ mnp notes; edit / check. Edit "Client Tax Letter" (re: Va state tax matters, with file research. Final review, Client Tax Letter, w/ mnp notes; edit. Cover email to JM, with drafts, both letters | 0.60 $275.00/hr | $165.00 |
| 02/29/12   | JTM | Telephone call with JT; Review MP emails; Conf. with MP; Prepare for AC meeting; Conf. with MH; Review draft letters | 1.60 $550.00/hr | $880.00 |
| 02/29/12   | MNP | Cnf. - JM (his review of draft correspondence, x 2; suggested revisions: draft Client Tax Letter, Tivvis Tax Letter; generating legal Memorandum for client). Cnf. - JM (IRS agent info); review JM email & attachment (same). Synthesize, draft legal Memorandum for client (tax issues); con't editing / check. Edit Tivvis Tax Letter. Edit Client Tax Letter. Cover email to JM, re: 3/1 client correspondence (x 3) | 1.20 $275.00/hr | $330.00 |
| 02/29/12   | SJM | Email AUSA Atkinson                           | 0.20 $550.00/hr | $110.00 |
| 02/29/12   | MSH | Email to NNEJ re: location of client; Fax to DC Correctional Treatment Center re: JM visit; Email to SC Correctional treatment center re: JM visit | 0.30 $275.00/hr | $82.50 |

|  | Hours: | 43.90 |  |
|--|--------|-------|--|
|  | Total Fees: |  | $16,352.50 |

Attorney/ Paralegal Summary

| JTM | Joseph T. Mallon  | 5.30 hours at $550.00 per hour  |
|-----|-------------------|---------------------------------|
| SJM | Steven J. McCool  | 13.10 hours at $550.00 per hour |
| JF  | Julia Fisher      | 3.90 hours at $75.00 per hour   |

Nova Datacom, LLC Investigation                                     February 29, 2012
                                                                                Page 6

| | | |
|---|---|---|
| MSH | Mark S. Henckel | 0.90 hours at $275.00 per hour |
| MNP | Marshall N. Perkins | 20.70 hours at $275.00 per hour |

**Expenses:**

| | | |
|---|---|---|
| 02/10/12 | Telephone expense | $106.95 |
| 02/17/12 | Printing (215 x .20). | $43.00 |
| 02/29/12 | Prior tax attorney retainer fee | $15,000.00 |
| | Total Expenses: | $15,149.95 |

PLEASE REMIT PAYMENT TO:

MALLON & McCOOL, LLC
300 E. LOMBARD STREET, SUITE 815
BALTIMORE, MARYLAND  21202

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Young N. Cho

vs

Mallon & McCool, LLC, Steven J. McC

Case Number: __2017 CA 000902 M__

Date: __February 10, 2017__

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Eric S. Montalvo | Relationship to Lawsuit |
| Firm Name:<br>Federal Practice Group | ☒ Attorney for Plaintiff |
| | ☐ Self (Pro Se) |
| Telephone No.:          Six digit Unified Bar No.:<br>202-862-4360              993206 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury  .  ☒ 6 Person Jury          ☐ 12 Person Jury

Demand: $ __$1,000,000.00__          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge:_____   Calendar #:_____

Case No.:_____   Judge:_____   Calendar#:_____

---

**NATURE OF SUIT:**     *(Check One Box Only)* Legal Malpractice

**A. CONTRACTS**                                **COLLECTION CASES**

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
        Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
        Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
        Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
        Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
        Under $25,000 Consent Denied

**B. PROPERTY TORTS**

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

**C. PERSONAL TORTS**

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☒ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☒ 16 Negligence- (Not Automobile,
        Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
        Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

# Information Sheet, Continued

## C. OTHERS

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 05 Ejectment
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)
- [ ] 10 Traffic Adjudication
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment

- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability
- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower

## II.

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment/Domestic
- [ ] 08 Foreign Judgment/International
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate
- [ ] 26 Petition for Civil Asset Forfeiture (Vehicle)
- [ ] 27 Petition for Civil Asset Forfeiture (Currency)
- [ ] 28 Petition for Civil Asset Forfeiture (Other)

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

## D. REAL PROPERTY

- [ ] 09 Real Property-Real Estate
- [ ] 12 Specific Performance
- [ ] 04 Condemnation (Eminent Domain)
- [ ] 10 Mortgage Foreclosure/Judicial Sale
- [ ] 11 Petition for Civil Asset Forfeiture (RP)

- [ ] 08 Quiet Title
- [ ] 25 Liens: Tax / Water Consent Granted
- [ ] 30 Liens: Tax / Water Consent Denied
- [ ] 31 Tax Lien Bid Off Certificate Consent Granted

---

/s/ Eric S. Montalvo

**Attorney's Signature**

February 10, 2017

Date



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Young N. Cho
_____
                                          Plaintiff

vs.                                                    Case Number   2017 CA 000902 M

Mallon & McCool, LLC
_____
                                          Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Eric S. Montalvo
_____
Name of Plaintiff's Attorney                         *Clerk of the Court*

1750 K Street, Suite 900 Washington, DC, 20006
_____
Address                                              By _____
                                                                          Deputy Clerk

202-862-4360
_____
Telephone                                            Date   02/13/2017

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ·

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                      CASUM.doc





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____ Demandante

contra

Número de Caso: _____

_____ Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____
Nombre del abogado del Demandante

_____
Dirección

_____
Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: _____
                    Subsecretario

Fecha: _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오      የትርጉም አገልግሎት ከፈለጉ ይደውሉ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Young N. Cho
_____
                                    Plaintiff

vs.                                    Case Number   2017 CA 000902 M

Joseph T. Mallon
_____
                                    Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Eric S. Montalvo
_____
Name of Plaintiff's Attorney                          *Clerk of the Court*

1750 K Street, Suite 900 Washington, DC, 20006
_____
Address                                 By _____
                                                    Deputy Clerk

202-862-4360
_____
Telephone                               Date   02/13/2017

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요      የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሱ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information about places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección                                    Subsecretario

Fecha _____

_____
Teléfono
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오      የአማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Telephone: (202) 879-1133**

Young N. Cho
_____
                                          Plaintiff

vs.                                          Case Number   **2017 CA 000902 M**

Steven J. McCool
_____
                                          Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Eric S. Montalvo
_____        _Clerk of the Court_
Name of Plaintiff's Attorney

1750 K Street, Suite 900 Washington, DC, 20006
_____        By _____
Address                                                          Deputy Clerk

202-862-4360
_____        Date   **02/13/2017**
Telephone
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                                    CASUM.doc





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
                                          Demandante

          contra

_____          Número de Caso: _____
                                          Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y 12:00 del mediodia los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                                    *SECRETARIO DEL TRIBUNAL*
_____
Nombre del abogado del Demandante

                                          Por: _____
_____
Dirección                                                    Subsecretario

                                          Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
     번역을 원하시면, (202) 879-4828 로 전화하십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

                                                                        CASUM.doc



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

YOUNG N. CHO
    Vs.                                    C.A. No.       2017 CA 000902 M
MALLON & MCCOOL, LLC et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge MICHAEL L RANKIN
Date:  February 13, 2017
Initial Conference: 10:30 am, Friday, May 12, 2017
Location:  Courtroom 517
           500 Indiana Avenue N.W.
           WASHINGTON, DC  20001                           Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief    Judge    Robert    E.    Morin

Caio.doc

D.C. Courts Home

## Court Cases Online

Case Search for Person: CHO, YOUNG

**Click here to view search criteria**

Search retrieved 24 cases in less than a second.

Selected 1 cases to view

**Click here to view search results**

Viewing single case; Details retrieved in less than a second.

**Click here to view case summary**

### 2017 CA 000902 M: CHO, YOUNG N. Vs. MALLON & MCCOOL, LLC, et al.

| | | | |
|---|---|---|---|
| Case Type: Malpractice | | File Date: 02/10/2017 | |
| Status: Open | | Status Date: 02/10/2017 | |
| Disposition: Undisposed | | Disposition Date: | |

| Party Name | Party Alias(es) | Party Type | Attorney(s) |
|---|---|---|---|
| CHO, YOUNG N. | | Plaintiff | MONTALVO, ERIC S. |
| MALLON & MCCOOL, LLC | | Defendant | |
| MALLON, JOSEPH T. | | Defendant | |
| MCCOOL, STEVEN J. | | Defendant | |

| Schedule Date | Schedule Time | Description |
|---|---|---|
| 05/12/2017 | 10:30 AM | Initial Scheduling Conference-60 |

| Docket Date | Description | Messages |
|---|---|---|
| 02/13/2017 | Service Issued | Issue Date: 02/13/2017<br>Service: Summons Issued<br>Method: Service Issued<br>Cost Per: $<br><br>MALLON & MCCOOL, LLC<br>300 E. Lombard Street, Suite 815<br>BALTIMORE, MD 21202<br>Tracking No: 5000184518<br><br>MALLON, JOSEPH T.<br>300 E. Lombard Street, Suite 815<br>BALTIMORE, MD 21202<br>Tracking No: 5000184519<br><br>MCCOOL, STEVEN J.<br>1776 K Street, N.W., Suite 200<br>WASHINGTON, DC 20006<br>Tracking No: 5000184520 |
| 02/13/2017 | Event Scheduled | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 05/12/2017 Time: 10:30 am<br>Judge: RANKIN, MICHAEL L Location: Courtroom 517 |
| 02/10/2017 | Complaint for Malpractice Legal Filed | Complaint for Malpractice Legal Filed<br>Attorney: MONTALVO, ERIC S. (993206)<br>YOUNG N. CHO (Plaintiff); Receipt: 360159 Date: 02/13/2017 |

| Receipt # | Date | From | Payments | Fee | Amount Paid |
|---|---|---|---|---|---|
| 360159 | 02/13/2017 | MONTALVO, ERIC S. | Efile      $120.00 | Cost      $120.00 | $120.00 |